JOHN M. ELLIOTT AND JANE D. ELLIOTT, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 29950–82, 28067–83.    Filed February 14, 1985.

*Marc A. Feller* and *Daniel F. Ryan*, for the petitioners.
*David Kuchinos*, for the respondent.

FEATHERSTON, *Judge*: Respondent determined deficiencies in petitioners' Federal income taxes as follows:

| Year | Amount |
| --- | --- |
| 1978 | $41,230 |
| 1979 | 21,364 |
| 1980 | 17,038 |

For 1980, respondent also determined that petitioners are liable for an addition to tax under section 6653(a)[1] in the amount of $852 but has now conceded that item. For convenience, petitioner John M. Elliott, whose activities produced the present controversy, will be referred to as petitioner.

The controlling issues for decision are as follows:

(1) Whether petitioner's activities in connection with the publication of a book entitled "The House on Wath Moor" constituted either a trade or business or the holding of property for the production of income in 1978, 1979, and 1980; the answer determines whether petitioner is entitled to

---

[1] All section references are to the Internal Revenue Code of 1954 as amended, unless otherwise noted.

deductions for printing-shipping costs under either section 162(a) or 212(1), deductions for depreciation under section 167(a), and an investment tax credit under section 38 and related sections; and

(2) Whether a nonrecourse promissory note given as part of the consideration for rights to the book entitled "The House on Wath Moor" was a genuine indebtedness. The answer controls petitioner's claim to an interest deduction under section 163.[2]

## FINDINGS OF FACT

Petitioners John M. and Jane D. Elliott, husband and wife, were legal residents of Philadelphia, Pennsylvania, when they filed their petition. Jane Elliott is a party to this proceeding only because she and her husband filed joint Federal income tax returns for 1978, 1979, and 1980, the years in issue.

The present controversy arises from the disallowance of alleged losses produced by the following deductions and credits claimed by petitioner on Schedules C of petitioner's income tax returns for 1978, 1979, and 1980 with respect to his investment in a book entitled "The House on Wath Moor" (hereinafter Wath Moor):

|  | 1978 | 1979 | 1980 |
|---|---|---|---|
| Printing-shipping costs | $8,000 | 0 | $1,056 |
| Accelerated depreciation | 24,778 | $44,050 | 34,260 |
| Additional first-year depreciation | 4,000 | 0 | 0 |
| Interest | 0 | 0 | 9,648 |
| Total deductions | 36,778 | 44,050 | 44,964 |
| Income reported | 0 | 6,000 | 10,704 |
| Loss claimed | 36,778 | 38,050 | 34,260 |
| Investment tax credit claimed | 22,700 | 0 | 0 |

Petitioner is a senior partner and co-chairman of the litigation department of one of the major law firms in Philadelphia. His income for each of the 3 years here in

[2]The parties have briefed other technical issues, including: (1) Whether petitioner "placed in service" in 1978 the assets with respect to which he claims deductions for depreciation and an investment credit for that year; (2) whether the nonrecourse note given as part of the consideration for the book rights acquired by petitioner may be recognized as part of his basis for depreciation and investment tax credit purposes; (3) whether an allocation of petitioner's book rights between tangible and intangible rights must be made; and (4) whether petitioner's claimed losses exceed the amount he had "at risk" under sec. 465 for 1979 and 1980. We find it unnecessary to deal with these technical issues.

dispute was sufficient to place him in the top brackets of the income tax rates. In late 1978, petitioner consulted with Thomas E. Doran (Doran), a member of petitioner's law firm, concerning steps he might take to minimize his tax liability. Through Doran, petitioner learned in mid-December 1978 of the possibility of investing in Wath Moor, a gothic novel written by an English author.

By letter dated December 7, 1978, Jonathan T. Bromwell & Associates, Inc. (Bromwell), had notified Jules R. Whitman, a partner in petitioner's law firm, of investment opportunities in the book area. The letter states the following:

Thank you for requesting the formal offering documents describing our high-quality investments/tax shelters in the publishing industry. We are certain that after you have had an opportunity to review the many impressive aspects of this investment, that you will find it ideal for inclusion in your portfolio; the anticipated profits and tax savings are substantial, while the risks are minimal. Briefly highlighting several of the outstanding features of this program, please note:

1. *4½ to 1 Leverage* - 1978 deductions and tax credits total approximately *4½ to 1* for each dollar invested. The aggregate deductions and credits for 1978 and 1979, the years in which the investment is paid, are approximately 4 to 1.

\*　　\*　　\*　　\*　　\*　　\*　　\*

5. *Conservative Evaluations* - Each paperback has been conservatively valued based upon our appraisers [sic] and in light of current prices for properties of this quality * * *

6. *Tax Audit Defense Fund* - We have retained a highly-acclaimed tax attorney to provide a "test case" defense of our tax positions (if they are ever challenged).

Prior to making the offering, Bromwell and entities with which it had dealt had entered into a series of agreements as follows:

1. *Agreement with author.*—By agreement dated December 14, 1978, Maureen Stephenson (Stephenson), author of Wath Moor, sold to Kensington Publishing Corp. (Kensington) the sole and exclusive right and license to manufacture, print, publish, and distribute Wath Moor in the English language exclusively in Canada, the Philippines, and the United States and its territories, and nonexclusively in the rest of the world, except in the British Commonwealth of Nations. The agreement obligated Kensington to publish 10,000 copies by Febru-

ary 1, 1981. As consideration for the agreement, Stephenson was to be paid royalties of 6 percent of the net retail sales of the first 150,000 copies and 8 percent of the net retail sales of all copies in excess of 150,000.

This agreement was the product of negotiations conducted by Roberta Grossman, president of Kensington, in October 1978. Kensington's business after 1977 involved exclusively the mass marketing of paperback books, including, during the period 1978–79, 8 to 12 gothic novels annually. Kensington owns and uses the imprint or trade name "Zebra Books" on the covers of the books that it markets. During 1978 and 1979, Kensington's Zebra Books had net sales of $2 to $2.5 million but had less than 1 percent of the mass-market paperback industry. In 1978, about a dozen other publishers had 90 to 95 percent of the paperback book market.

2. *Acquisition agreement.*—By contract dated October 20, 1978, Kensington sold its rights, title, privileges, interest, and ownership in the book properties pertaining to Wath Moor, together with the right to print, publish, distribute, and sell Wath Moor in paperback form to Bromwell, one of its subsidiaries. The agreement specifically excluded radio and television rights from the transfer. As consideration for the transfer, Bromwell agreed to pay Kensington $4,000 in cash (downpayment of $1,000 plus $3,000 by the end of 1978) and to execute and deliver a nonnegotiable, nonrecourse promissory note due on October 1, 1987, in the amount of $198,000 bearing interest at the rate of 6 percent per annum. The interest and principal of the note were to be paid semiannually from 60 percent of the net dollars derived and actually received from sales after returns and after a reasonable reserve for returns of books. The only security for the note in the event of default was forfeiture of the rights to the property transferred. Bromwell executed the note under date of October 20, 1978.

In connection with the making and giving of the $198,000 nonnegotiable promissory note by Bromwell to Kensington, Bromwell and Kensington entered into a security agreement, dated October 20, 1978, whereby Bromwell, as debtor, conveyed to Kensington, as the secured party, all of Bromwell's right, title, and interest in and to the book properties pertinent to Wath Moor to secure the payment of the note.

3. *Services agreement.*—By agreement dated October 20, 1978, Bromwell entered into a services agreement with Hercules Service Corp. (Hercules), another subsidiary of Kensington, with regard to certain services to be performed with respect to Wath Moor. Hercules was newly formed to promote Wath Moor and some other books that Kensington was selling to Bromwell.

Under the terms of the agreement, Hercules agreed to produce, print, bind, distribute, sell, and promote the book for a period of 9 years. The agreement stated that Hercules was to print, bind, and have distributed for retail sale to the public no less than 35,000 copies of Wath Moor prior to the end of 1978. Hercules further agreed to publish a second printing of Wath Moor in a number equal to at least 75 percent of the number of copies sold during the 3 years prior to the publication of the second printing; however, if Hercules printed a number of copies equal to at least 50 percent of the initial guaranteed printing of 35,000 copies, then the obligation of Hercules would be satisfied.

Under the services agreement, Hercules was to receive $8,000 from Bromwell for the first 9,768 books sold and 32 cents each for the next 28,732 books sold. After 35,000 books were sold, Hercules was to receive 13.3 cents for each book sold. Hercules warranted in the agreement that Bromwell would receive at least $6,000 out of the first receipts by Hercules from the sale of the books, payable not later than 16 months after the date of the initial publication.

A schedule attached to the services agreement states that the anticipated cover price for Wath Moor was $1.95 and that the "number of copies required to be sold to recoup costs" was 367,647. Of all the gothic novels that Kensington has published under the Zebra imprint, none has achieved a printing of as many as 100,000 copies.

4. *Review and investigation by petitioner.*—Copies of all of these agreements together with a 72-page "Confidential Memorandum" (offering memorandum) were made available to petitioner for review. In addition, exhibits attached to the offering memorandum included: (1) A commitment agreement to be signed by Bromwell and a purchaser of a book, (2) a list of the titles of 53 books, including Wath Moor, available for purchase; (3) a legal opinion by the law firm of Weiss,

Rosenthal, Heller & Schwartzman on the tax consequences to the purchaser of one of the books; and (4) a one-paragraph synopsis of each of the 53 books offered for sale, together with a brief biographical sketch of the author and financial data. As to Wath Moor, the financial data was as follows:

*Cash cost to be paid over 2 years*

| | |
|---|---:|
| At closing | $17,000 |
| Feb. 15, 1979 | 14,000 |
| Total cash cost | 31,000 |
| Guaranteed income to be applied to payment | 6,000 |
| Nonrecourse note | 198,000 |
| Total cost | 235,000 |

Guaranteed income: $6,000
Initial printing: 80,000 copies

On 39 of the books described in the offering memorandum, the financial data was the same as that set forth above; another set of financial data was shown for the other 14 books. Among the other attachments to the offering memorandum was a statement of other financial data in tabular form including an anticipated cover price of $1.95 for Wath Moor and a statement that 367,647 copies would have to be sold to pay the principal of the nonrecourse note.

Among the materials that petitioner received from Bromwell was the following statement illustrating the investment and tax aspects of owning one of Bromwell's books:

### CLASS A INVESTMENT

| | |
|---|---:|
| Total cash investment paid over 2 years | $31,000 |
| Minimum guaranteed income applied to purchase price | 6,000 |
| Nonrecourse promissory note | 198,000 |
| Total price | 235,000 |

| | 1978 | 1979 |
|---|---:|---:|
| Payment on closing | $17,000 | 0 |
| Payment due Feb. 15, 1979 | 0 | $14,000 |
| Total cash investment | 17,000 | 14,000 |

### TAX BENEFITS AND INCOME

| | | |
|---|---:|---:|
| Net tax deductions | 42,000 | 37,000 |
| Investment tax credit | 22,700 | 0 |

| | | |
|---|---:|---:|
| Guaranteed cash flow | | |
| (to be applied to purchase price)..................................... | 0 | $ 6,000 |
| Cumulative tax savings and cash flow: | | |
| For 50% income tax bracket..................................... | $43,700 | 68,200 |
| For 70% income tax bracket..................................... | 52,100 | 84,000 |

Prior to his investment in Wath Moor, petitioner had never purchased or otherwise invested in any venture involving the production, distribution, or exploitation of books. Apart from the offering memorandum materials, he knew nothing about the author of Wath Moor or the book itself. He reviewed the offering memorandum and related materials but did not seek any independent advice on the value of Wath Moor, or the economic feasibility of publishing it, before making his investment.

The offering memorandum states that the seller had obtained opinion letters from two individuals, experienced in the industry, which "may serve as some evidence of the reasonableness of the selling price of the Properties." (The contents of these letters are described in the opinion portion which follows.) One of the letters is dated December 20, 1978, and the other is dated December 27, 1978. Petitioner did not obtain the opinion of an expert of his own choosing on the economic feasibility of the offered investment.

Prior to petitioner's investment, petitioner engaged in no negotiations regarding the terms of the purchase of Wath Moor. The purchase price was set forth in the offering memorandum, was dictated by Bromwell, and was inflexible. Petitioner made no effort to get the purchase price reduced.

5. *Purchase and assumption agreement.*—By agreement dated December 26, 1978, Bromwell sold to petitioner all of Bromwell's right, title, interest, and ownership in Wath Moor, and all of Bromwell's rights and interest in and under the acquisition agreement described above. Under the same date, Bromwell assigned to petitioner the services agreement made between Bromwell and Hercules.

By letter of the same date, petitioner instructed Hercules to pay to Bromwell the first $6,000 received from such sales in accordance with the agreement. Petitioner also instructed Hercules to pay directly to Kensington 60 percent of the gross receipts from the sales of copies of Wath Moor in excess of the

first $6,000 of such proceeds until the $198,000 nonrecourse note plus interest had been paid.

By letter dated December 26, 1978, petitioner advised Kensington that he had purchased from Bromwell all of the properties acquired by Bromwell from Kensington relating to Wath Moor, as well as all related covenants and agreements, and had assumed all of Bromwell's obligations under the $198,000 nonnegotiable promissory note.

By letter dated December 26, 1978, Roberta Grossman, president of Kensington, advised petitioner that Kensington would look only to Hercules for payment of the 60 percent of gross receipts payable under the nonnegotiable promissory note.

In connection with the December 26, 1978, purchase and assumption agreement, petitioner paid Bromwell $17,000 by check of that date. By check dated February 13, 1979, petitioner made another payment to Bromwell in the amount of $14,000 as provided by the agreement.

It is the general practice of Kensington and Hercules to solicit orders for books 3 or 4 months before the book is ready for retail sale. The promotional covers for Wath Moor were printed and made available in late December 1978 to Kable News Co. (Kable), a national distributor, for the purpose of soliciting orders for the book. The covers for the sale copies were printed on March 1 and 2, 1979.

Wath Moor was printed by Offset Paperback Manufacturers, Inc., of Dallas, Pennsylvania. A total of 30,502 copies were printed based on the number of orders that had been obtained. The first printing was finished on March 10, 1979, and shipments were completed on March 15, 1979.

As of June 30, 1982, 30,502 copies of Wath Moor had been distributed; 13,265 copies had been sold; 15,743 copies had been returned unsold, and 125 copies were still available for sale. As of June 30, 1982, total gross receipts from the sale of Wath Moor were $10,864. Of that amount, $7,119.04 had been paid to Hercules under the services agreement, $2,918.40 had been paid to Kensington as interest on the nonnegotiable promissory note, $825.28 had been paid to petitioner, and $1.28 was due to petitioner.

Petitioner did not get involved in any way in the day-to-day decision making with respect to the promotion and exploita-

tion of Wath Moor. He was not aware of the type of advertising campaign, if any, that the services contractor undertook in connection with the promotion of the book. He did not know how many books had been printed or sold. Petitioner kept no books of account with respect to Wath Moor.

In 1982, Wath Moor was reprinted with a new cover but the same text under the title "House on the Heath." The decision to market Wath Moor under a new title was made by Kensington without consulting petitioner.

In the notices of deficiency, respondent disallowed the Schedule C losses claimed on petitioner's income tax returns for 1978, 1979, and 1980.

## ULTIMATE FINDINGS OF FACT

(1) Petitioner's activities in connection with Wath Moor were not undertaken or carried out with an actual and honest objective of making a profit.

(2) The amount of the nonnegotiable, nonrecourse note in the amount of $198,000 unreasonably exceeded the value of Wath Moor and was not a genuine indebtedness.

## OPINION

Petitioner's claim to the disallowed deductions for the Wath Moor printing-shipping costs for 1978 and 1980 depends on a showing that these amounts were ordinary and necessary expenses paid or incurred during the taxable year in carrying on a "trade or business" within the meaning of section 162(a), or ordinary and necessary expenses paid or incurred during the taxable year "for the production * * * of income" within the meaning of section 212(1). To qualify the claimed depreciation deductions, petitioner must show, among other things, that the property was used in his "trade or business" or was held "for the production * * * of income" within the meaning of section 167(a). The investment credit is allowable, according to section 48(a)(1), only for "property with respect to which depreciation (or amortization in lieu of depreciation) is allowable."

Thus, petitioner's right to the printing-shipping and depreciation deductions as well as to the investment credit depends on petitioner's showing that his Wath Moor activity constituted a

trade or business or was undertaken and carried on for the production of income. See *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983); *Pike v. Commissioner*, 78 T.C. 822, 841–842 (1982), affd. without published opinion 732 F.2d 164 (9th Cir. 1984).

Petitioner's right to the claimed section 163 interest deduction depends upon a showing that the nonrecourse note was a genuine indebtedness. See *Odend'hal v. Commissioner*, 80 T.C. 588, 604–605 (1983), affd. 748 F.2d 908 (4th Cir. 1984), and cases cited.

### 1. Printing-Shipping Cost, Depreciation, and Investment Credit

Essential to petitioner's showing that his activities with respect to Wath Moor constituted a trade or business or that Wath Moor was held for the production of income is a demonstration of an "actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 646 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984); *Dean v. Commissioner*, 83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. *Fox v. Commissioner*, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. *Kratsa v. Commissioner*, 734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. *Hook v. Commissioner*, 734 F.2d 5 (3d Cir. 1984).

The issue as to whether a transaction is undertaken with a profit objective is one of fact to be resolved not on the basis of one factor alone but on the basis of all the facts and circumstances. *Allen v. Commissioner*, 72 T.C. 28, 34 (1979); *Jasionowski v. Commissioner*, 66 T.C. 312, 319, 321 (1976). Some of the relevant factors to be considered in determining whether an activity is engaged in for profit are listed in section 1.183–2(b), Income Tax Regs.[3] In deciding the issue as to

---

[3]Sec. 1.183–2. Activity not engaged in for profit defined.

(b) *Relevant factors*. In determining whether an activity is engaged in for profit, all facts and circumstances with respect to the activity are to be taken into account. No one factor is

whether petitioner's Wath Moor activity was engaged in for profit, greater weight is to be given to objective facts than to a mere statement of a taxpayer's intent. *Siegel v. Commissioner*, 78 T.C. 659, 696–698 (1982); *Engdahl v. Commissioner*, 72 T.C. 659, 666 (1979).

Based on all of the evidence of record, we find that petitioner did not engage in the Wath Moor activity with an actual and honest objective of making a profit and that, consequently, such activity was not a trade or business or an undertaking for the production of income. Rather, we are convinced that petitioner engaged in the Wath Moor transaction primarily, if not exclusively, in order to obtain tax deductions and credits and thereby reduce the tax he would otherwise have to pay on his substantial income from other sources. Petitioner is not, therefore, entitled to the claimed printing-shipping and depreciation deductions or the disputed investment credit.

We begin with the fact that petitioner's first step toward the Wath Moor deal was his consultation in late 1978 with Doran, a member of his law firm. The clear inference is that he wished to minimize his income taxes. The literature on the Wath Moor offering showed that it certainly promised to fulfill that objective. For his $17,000 investment in 1978, according to the statement from Bromwell, quoted in our findings, which illustrated the tax aspects of the investment, petitioner would receive tax savings ranging from $43,700 (50-percent bracket) to $52,100 (70-percent bracket) in that year alone. For another $14,000 in 1979, his cumulative tax savings and cash flow would rise to amounts ranging from $68,200 (50-percent bracket) to $84,000 (70-percent bracket). "Where, as here, the promised tax benefits are suspiciously excessive and," as we

---

determinative in making this determination. In addition, it is not intended that only the factors described in this paragraph are to be taken into account in making the determination, or that a determination is to be made on the basis that the number of factors (whether or not listed in this paragraph) indicating a lack of profit objective exceeds the number of factors indicating a profit objective, or vice versa. Among the factors which should normally be taken into account are the following:

(1) *Manner in which the taxpayer carries on the activity.* * * *

(2) *The expertise of the taxpayer or his advisors.* * * *

(3) *The time and effort expended by the taxpayer in carrying on the activity.* * * *

(4) *Expectation that assets used in activity may appreciate in value.* * * *

(5) *The success of the taxpayer in carrying on other similar or dissimilar activities.* * * *

(6) *The taxpayer's history of income or losses with respect to the activity.* * * *

(7) *The amount of occasional profits, if any, which are earned.* * * *

(8) *The financial status of the taxpayer.* * * *

(9) *Elements of personal pleasure or recreation.* * * *

shall discuss, "the transaction as a whole is entered into and carried out with a complete indifference to profit, it is clear what the parties intended to accomplish." *Flowers v. Commissioner*, 80 T.C. at 941. We are convinced that the primary, if not the only, objective petitioner sought to accomplish was the reduction of his taxes.[4]

These suspiciously high tax benefits were made possible by the use of the $198,000 nonrecourse note as part of the claimed basis for depreciation and investment tax credit purposes. The use of large nonrecourse financing compared with a small cash investment is not necessarily fatal to establishing a profit objective, but we think it is a strong factor working against petitioner in this case because there was no practical probability that the note would be paid. *Barnard v. Commissioner*, 731 F.2d 230, 231 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983); *Estate of Baron v. Commissioner*, 83 T.C. 542, 556 (1984). To pay the full amount of the note, according to the offering memorandum and Bromwell's "expert" reports, would have required sales of approximately 370,000 copies of Wath Moor. As indicated in our findings, Kensington had never printed, let alone sold, as many as 100,000 copies of any gothic novel, and Wath Moor had nothing outstanding to recommend it. Informed experts were of the opinion that a maximum of 30,000 copies would be sold. In fact, net sales came to only 13,265 as of June 30, 1982.

Notwithstanding the bleak prospects for profit from the deal, petitioner did nothing to attempt to negotiate a smaller purchase price. He simply accepted Bromwell's offer on terms which the parties have stipulated were "inflexible." The record is devoid of any evidence showing that the purchase

---

[4]The following statement in *Barnard v. Commissioner*, 731 F.2d 230, 231 (4th Cir. 1984), affg. *Fox v. Commissioner*, 80 T.C. 972 (1983), is apposite:

"Summarily, the tax-minimizing scheme, an evasion not a mere avoidance of tax liability, was structured so that, if not a single copy of the book were ever marketed, nevertheless, the 'deductions' generated for income tax purposes would, for high bracket taxpayers * * *, be so great that they would, if the fabricated "deductions" were allowed, reduce taxes by a substantially greater amount than the relatively small sums contributed in cash * * * by each taxpayer."

Notwithstanding the above illustrations of tax savings offered by the Wath Moor plan, petitioner's testimony alludes to potential unidentified tax recapture liabilities. We are not convinced (and he does not argue on brief), however, that the tax recapture provisions were seriously considered; even if they were, the Wath Moor scheme contemplated, as a minimum benefit, the extended deferral of any tax liabilities subject to recapture. *Rice's Toyota World, Inc. v. Commissioner*, 752 F.2d 89 (4th Cir. 1985), affg. in part and revg. in part 81 T.C. 184 (1983).

price for Wath Moor was in any way determined with a "true regard for the profitability of the activity." *Brannen v. Commissioner*, 78 T.C. 471, 509 (1982), affd. 722 F.2d 695 (11th Cir. 1984); *Fox v. Commissioner*, 80 T.C. at 1010. In fact, from petitioner's standpoint, there was no incentive to negotiate for a lower nonrecourse liability because a lower amount would have only reduced his basis for depreciation and investment credit purposes and, concomitantly, his tax benefits. Cf. *Fox v. Commissioner, supra* at 1009.

Furthermore, petitioner did not even investigate the economic feasibility of the Wath Moor proposal, and failure to make such an investigation tends to show the absence of a "business-like manner of operation." Sec. 1.183–2(b)(1), Income Tax Regs. *Surloff v. Commissioner*, 81 T.C. 210, 237 (1983); *Fox v. Commissioner*, 80 T.C. at 1015. Petitioner had no experience in publishing and selling books. In Bromwell's offering memorandum, he was warned that: "Only a small percentage of all books published whether hard cover and/or soft cover generate a profit to their publishers." The memorandum adds, in substance, that sales of the offered book publication rights will be made only to persons with a net worth of at least $200,000 and some portions of whose income would be subject to tax at a rate of 48 percent (with respect to corporations) and 50 percent (with respect to individuals).

Given these and other similar warnings in the offering memorandum, a reasonably prudent profit-motivated investor who had no previous book publishing experience, proceeding in a business-like manner, would be expected to obtain some expert guidance. In fact, the offering memorandum states that "Each Purchaser who lacks experience in the publishing industry is advised to retain a consultant to assist him in connection with the commercial exploitation of any Properties he acquires." Petitioner did not do so. He sought no outside information on the hazards or prospects of publishing-venture investments. Nor did he seek any independent advice with regard to the value of Wath Moor or its sales potential. He knew nothing, and sought to learn nothing, about its author or the salability of her writings beyond the brief biographical sketch in an attachment to the offering memorandum.

The offering memorandum stated that Bromwell had caused the several books it was offering for sale to be reviewed by two

individuals experienced in the publishing business and that their written opinions were available for inspection. One of these "appraisals" is dated December 20, 1978, and states:

9. The purchase price of the above book is $227,000. In order to reach this figure, to the best of my knowledge, approximately 370,000 copies of the literary work noted must be sold.

10. I project that the revenues from the proper exploitation of this book may, at least, meet the purchase price. Indeed, after deduction of all costs under the service agreement, they may exceed it.

The other appraisal, dated December 27, 1978, 1 day after petitioner made his purchase, reaches almost exactly the same conclusions in 12 similarly numbered and ordered paragraphs but in different words which appear to have been carefully chosen because of their difference.

Petitioner testified that one of the things he relied on in the offering memorandum was the representation that he would receive two letters concerning the fair market value of the book. Petitioner further testified that "I assure you if there were ever misrepresentations that were made to me in any way, I will pursue those representations through the litigation resources that I have at my disposal."

We seriously doubt that petitioner, an accomplished trial lawyer, proceeding in a businesslike manner in handling a case of the magnitude of this transaction, would allow his adversary (in this case, Bromwell, the seller) to select his expert witnesses. Nor do we think he would find very convincing the tentative opinions that Bromwell's alleged experts expressed in those strikingly similar "appraisals." Significantly, neither of the individuals who made the appraisals was called to testify at the trial of the instant case.

Had petitioner consulted experts of the caliber of two witnesses called by respondent, Stephen Conland (Conland) and Robert Sachs (Sachs), both of whom had years of experience in the publishing business, he would have learned that the Wath Moor rights acquired by petitioner had a value of between $0 (according to Conland) and approximately $7,800 (according to Sachs). He would have learned that there was no practicable probability that he would make a profit or that he would even recover his $31,000 cash investment. As of December 26, 1978, a reasonable estimate of net sales was 26,250 copies (according to Conland) and 30,000 (according to Sachs).

These estimated sales are to be contrasted with the sales of approximately 370,000 required, according to the offering memorandum and the Bromwell-furnished experts, to pay the nonrecourse note. He would have learned also that Kensington, as stated above, had never printed, let alone sold, as many as 100,000 copies of a gothic novel and that, in the judgment of experts, there was nothing unique about Wath Moor or its author, who was virtually unknown, to suggest that any unusually large number of copies of Wath Moor would be sold.

Apart from these estimates, petitioner would have also learned that Kensington did not have a strong position among competing publishers in 1978, and this relatively weak position would make it even less likely that Wath Moor would succeed. About a dozen other publishers had 90 to 95 percent of the mass paperback book market. Kensington's Zebra Books commanded less than 1 percent of the market. The shelf life of a paperback book is only a few weeks, and the larger publishers can take advantage of these few weeks much more effectively than can a smaller publisher like Kensington.

By consulting experts, petitioner would have also learned that the Bromwell-Hercules-Kensington agreements, reviewed in our findings, were structured in such way as practically to preclude sales of enough copies of Wath Moor to make a profit. Putting a quantity of paperback books on the market in 1978 cost approximately 45 cents per copy. By assuming Bromwell's services agreement with Hercules, petitioner became obligated to pay Hercules 82 cents for each of the first 9,768 copies of Wath Moor, 32 cents for each of the next 28,732 copies, and 13.3 cents for each additional copy thereafter. Thus, Hercules would suffer substantial losses on the printing of copies of Wath Moor in excess of 38,500 copies; the losses would amount to approximately $100,000 for printing the 330,000 copies (above the 38,500 copies) required to pay the nonrecourse note. Hercules, which would suffer this loss, was a subsidiary of Kensington, and Kensington controlled the marketing of Wath Moor. Experts would have advised petitioner that Kensington would hardly be expected to handle the sales program in such a way as to cause Hercules to incur such a huge loss. We think a conscientious, qualified expert would have advised petitioner that any prospect of the printing and sale of enough copies to permit him to recover even his cash outlay was illusory.

True, petitioner called as an expert witness an individual who testified that Wath Moor had a value of $198,000 based on a sale of 250,000 copies at $1.95 per copy and a value of $267,176.26 based on a sale of 250,000 copies at $2.50 per copy. The testimony of this witness, who had only limited experience in reviewing paperback book manuscripts, was not credible, however. He was unable to state the date as of which his value and sales estimates were made. He failed to adjust his value estimates for royalties payable to the author, and her royalties on the sales of 250,000 copies would be in the range of $33,000. In fact, on cross-examination, he admitted that arriving at a fair market value appraisal is "not generally in the area of the thing that I do."

Petitioner's witness testified that he based his 250,000 estimated sales figure for Wath Moor on the ability of the chairman of Kensington's board to market his product. But the witness admitted that he did not know what Kensington's share of the paperback book market was in 1978 or that Kensington had never printed, let alone sold, as many as 100,000 copies of any single gothic novel. As to the suggested $2.50 sales price, both the offering memorandum and the services agreement state that the anticipated sales price of Wath Moor was $1.95 per copy. Not until the book was reprinted under the title "House on the Heath" in 1982 was the $2.50 price used. The testimony of petitioner's witness, in our opinion, is not worthy of any weight in deciding the issues here presented. See *Flowers v. Commissioner*, 80 T.C. at 940–941 n. 40.

After petitioner acquired Wath Moor, he did not participate in any way in decisions with respect to the management of the business; he left everything to Hercules and Kensington. In his words: "I relied totally upon what they did." Even though it must have been apparent to him within a few months that the business was not working out as he now says he expected, he did not inquire as to when the printing was completed nor as to what publicity or other promotional activities were undertaken. He never asked for information to enable him to ascertain whether Hercules and Kensington were carrying out their contractual responsibilities efficiently or conscientiously. Indeed, he was not even contacted at all with respect to the

reprinting and distribution of the book under the name "House on the Heath."

In summary, we find that petitioner has not carried his burden of proving that he had an actual and honest objective of making a profit from publishing Wath Moor. He entered the deal near the end of 1978 only after seeking advice from a tax attorney on how he could minimize his taxes. The transaction as presented to him showed that it was highly leveraged. Although he had no expertise in the publishing business, he made no real investigation of the proposal. After he became aware that the business was not succeeding, he devoted no time to attempt to rectify the situation. He neither entered the deal nor handled his investment in a businesslike manner. We conclude that petitioner's Wath Moor activities were not undertaken or carried out with an actual and honest objective of making a profit and that they were not, therefore, a trade or business. Petitioner is not entitled to the disallowed printing-shipping and depreciation deductions or the investment tax credit.

Petitioner's position, if we understand it, is that respondent's argument "ignores the realities of the business world." He contends that he handled his Wath Moor investment in the same manner as numerous others he has made. He reviewed the offering memorandum, decided Wath Moor would be a good investment, advanced the $17,000 in December 1978 and the $14,000 in February 1979, and left everything else to the publishing experts, Kensington and Hercules. He was too busy in the practice of law, he argues, to attempt to exercise business judgments in the publishing world. He maintains that he believed "that it was reasonable for him to rely on the expertise of Kensington and Hercules and felt that they were more qualified than he was to make business decisions regarding the profitable exploitation of Wath Moor."

Petitioner's arguments have a hollow ring. They would be more pertinent if petitioner were seeking to justify a loss from a passive capital investment. This case, however, does not involve a passive capital investment; it involves an alleged trade or business. Petitioner is here seeking to justify losses attributable to trade or business deductions under section 162(a) or "for the production of income" under section 212(1), and depreciation deductions and an investment credit which

are allowable only if he used the Wath Moor book properties in a trade or business or held the Wath Moor properties for the production of income as required by section 167(a). Essential to a trade or business or an income-producing activity that will support the tax benefits claimed by petitioner is an actual and honest objective of making a profit. *Hirsch v. Commissioner*, 315 F.2d 731, 736 (9th Cir. 1963), affg. a Memorandum Opinion of this Court; *United States v. Gilmore*, 372 U.S. 39, 48 (1963). Petitioner had no such objective. The facts make it almost inconceivable that petitioner would have entered the Wath Moor deal as a passive capital investment financed mainly by an excessive nonrecourse note without any claim to depreciation deductions and an investment credit. Thus, petitioner's arguments in this regard are inapposite.

We think it apparent that petitioner's objective was not to make a business profit, but rather to reap the tax benefits provided by the highly leveraged Wath Moor deal. This case is indistinguishable in principle from *Fox v. Commissioner*, 80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir. 1984), affd. without published opinions sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5–7, 9 (3d Cir. 1984); *Dean v. Commissioner*, 83 T.C. 56 (1984); *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984); *Ziegler v. Commissioner*, T.C. Memo. 1984–620.

## 2. *The Interest Deduction*

Section 163(a) provides for the allowance of a deduction for "all interest paid or accrued within the taxable year on indebtedness." For the deduction to be allowable, however, the indebtedness must be genuine because nonrecourse loans offer obvious opportunities for trifling with reality. In *Hager v. Commissioner*, 76 T.C. 759, 773–774 (1981), the Court stated:

It is settled that amounts paid as interest must be paid on genuine indebtedness to be deductible under section 163(a) (*Knetsch v. United States*, 364 U.S. 361 (1960); *Narver v. Commissioner*, 75 T.C. 53, 98 (1980), on appeal (9th Cir., Jan. 15, 1981); *Golsen v. Commissioner*, 54 T.C. 742, 754 (1970), affd. 445 F.2d 985 (10th Cir. 1971) * * *. In the usual sale of property, if part or all of the purchase price is deferred, the obligation to pay the deferred amount represents genuine indebtedness and an investment in property. Even if

such an obligation is secured only by the transferred property or other property and the buyer has no personal liability for its payment, the obligation still represents genuine indebtedness and an investment in property. *Mayerson v. Commissioner, supra* at 351–352; see *Crane v. Commissioner*, 331 U.S. 1 (1946). However, such conclusions do not follow when the principal amount of such nonrecourse indebtedness unreasonably exceeds the value of the security therefor because, under such circumstances, it is patent that the purchaser has no incentive to pay off the obligation.

If the purchase price and the principal amount of the nonrecourse note unreasonably exceed the value of the property to be purchased, then no "genuine indebtedness exists."[5] *Estate of Franklin v. Commissioner*, 544 F.2d 1045 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Hager v. Commissioner*, 76 T.C. 759 (1981); *Odend'hal v. Commissioner*, 80 T.C. 588, 604–605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984). In *Estate of Franklin v. Commissioner*, 544 F.2d at 1048–1049, the court explained the rationale as follows:

An acquisition such as that of Associates if at a price approximately equal to the fair market value of the property under ordinary circumstances would rather quickly yield an equity in the property which the purchaser could not prudently abandon. This is the stuff of substance. It meshes with the form of the transaction and constitutes a sale.

No such meshing occurs when the purchase price exceeds a demonstrably reasonable estimate of the fair market value. Payments on the principal of the purchase price yield no equity so long as the unpaid balance of the purchase price exceeds the then existing fair market value. Under these circumstances the purchaser by abandoning the transaction can lose no more than a mere chance to acquire an equity in the future should the value of the acquired property increase. While this chance undoubtedly influenced the Tax Court's determination that the transaction before us constitutes an option, we need only point out that its existence fails to supply the substance necessary to justify treating the transaction as a sale *ab initio*. It is not necessary to the disposition of this case to decide the tax consequences of a transaction such as that before us if in a subsequent year the fair market value of the property increases to an extent that permits the purchaser to acquire an equity. [Fn. ref. omitted.]

The court also said (544 F.2d at 1049):

---

[5]In *Brannen v. Commissioner*, 78 T.C. 471, 493 (1982), affd. 722 F.2d 695 (11th Cir. 1984), this Court stated that the test was whether the stated purchase price unreasonably exceeded the value of the property, whereas in *Hager v. Commissioner*, 76 T.C. 759, 774–775 (1981), this Court stated that the test was whether the principal amount of the nonrecourse indebtedness unreasonably exceeded the value of the property. We need not decide that issue here because both the purchase price and the principal amount of the nonrecourse note far exceeded the value of the rights to Wath Moor.

To justify the deduction the debt must exist; potential existence will not do. For debt to exist, the purchaser, in the absence of personal liability, must confront a situation in which it is presently reasonable from an economic point of view for him to make a capital investment in the amount of the unpaid purchase price. * * *

In our discussion of issue 1, we have concluded that the nonrecourse note in this case was not given in connection with a bona fide profit-seeking activity. In reaching this conclusion, we reviewed the expert testimony which shows that there was no realistic possibility that the nonrecourse note would be paid. Compared with a total purported "consideration" of $235,000, the Wath Moor book properties had a fair market value of $0 to $7,800. Compared with sales of almost 370,000 copies required to recoup all costs, including the nonrecourse note, a reasonable estimate of actual potential sales was 26,250 to 30,000 copies. We pointed out that Kensington had never printed, let alone sold, as many as 100,000 copies of a gothic novel. And petitioner's own expert witness estimated potential sales at 250,000 copies.[6]

We conclude that the $198,000 nonrecourse note was not genuine indebtedness. The note was not given in connection with a good-faith profit-seeking activity. Its amount far exceeded the value of Wath Moor. There was no realistic prospect that it would be paid. The claimed interest deduction in 1980 is not, therefore, allowable.[7]

---

[6] In *Milbrew v. Commissioner*, 710 F.2d 1302 (7th Cir. 1983), affg. a Memorandum Opinion of this Court, property bought in mid-1967 for $525,000 was purportedly sold in early 1969 for a note of $3 million. Holding that the note was not genuine indebtedness, the court said (p. 1307):

"It cannot carry the day for * * * [the taxpayer] merely to show that the plant was worth *between* what Northland had paid in 1967, $525,000, and what NVST purported to pay Northland in 1969, $3 million."

[7] We have found it unnecessary to deal with respondent's arguments that, because the nonnegotiable note was not genuine indebtedness, it may not be taken into account in computing petitioner's basis for depreciation purposes under sec. 167, his actual investment for sec. 38 investment tax credit purposes, or the amount of his investment at risk (for 1979 and 1980) for purposes of sec. 465. Nonetheless, we observe that the reasoning of the cases cited in the text on this issue supports respondent's argument. See particularly *Hager v. Commissioner*, 76 T.C. 759, 773–774 (1981); *Odend'hal v. Commissioner*, 80 T.C. 588, 604–605 (1983), affd. on this issue 748 F.2d 908 (4th Cir. 1984), and cases cited.

Petitioner argues that *Commissioner v. Tufts*, 461 U.S. 300 (1983), requires the nonrecourse note recognized, but see *Odend'hal v. Commissioner*, supra; *Dean v. Commissioner*, 83 T.C. 56, 78 n. 10 (1984); *Fuchs v. Commissioner*, 83 T.C. 79, 102 n. 10 (1984), rejecting this argument.

### 3. Allocation of Allowed Deductions

In the notices of deficiency for 1979 and 1980, respondent disallowed only the claimed losses of $38,050 and $34,060, respectively. The effect of this treatment was to allow deductions equal to the amounts of income reported from the Wath Moor activity, $6,000 in 1979 and $10,704 in 1980 in accordance with section 183(b).[8]

In *Odend'hal v. Commissioner*, 748 F.2d at 908, the Court of Appeals affirmed this Court's opinion but remanded the case to this Court for an allocation of the allowed amounts among the claimed deductions because such an allocation "affects the taxpayers' basis for a future transfer and possibly also the yearly computation of depreciation if anything other than a straight-line method is authorized and employed." For 1978, no income was reported and no deductions are, therefore, allowable. For 1979, the only deduction claimed by petitioner was accelerated depreciation, and the full amount of the allowable amount is allocable to that deduction. As to 1980, the reported income of $10,704 exactly equals the claimed deductions for printing-shipping ($1,056) plus interest ($9,648); if an *Odend'hal* allocation is required with respect to these deductions, we think it would be appropriate to allocate the allowable amounts to those items because the income was evidently applied mainly to them.

In conclusion, we note that this is now the fifth case to have come before us involving taxpayers who have invested in book properties, not for any true business purpose, but for the purpose of generating artificially high tax deductions through nonrecourse debt which bears no relationship to the actual fair market value of the book properties purchased. In each of these five cases, we have concluded that the taxpayers had no honest profit objective in engaging in the activity, and that the nonrecourse debt involved was not a genuine indebtedness.

---

[8]SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT.

(b) DEDUCTIONS ALLOWABLE.—In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed—

(1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and

(2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1).

Thus, we have denied the claimed deductions and credits generated by the book investments. Three Courts of Appeals reviewed this Court's decisions in the *Fox* cases and affirmed them.

This case was well tried and skillfully briefed by able counsel, but neither the evidence nor the briefs present anything new. At some point, the arguments in these highly leveraged tax avoidance (or evasion) schemes must be regarded as "frivolous or groundless." Sec. 6673.

To reflect the foregoing,

*Decisions will be entered for the respondent.*