EDWIN P. MORROW AND CHARLENE C. MORROW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morrow v. Commissioner
Docket No. 44710-85
United States Tax Court
T.C. Memo 1988-372; 1988 Tax Ct. Memo LEXIS 402; 55 T.C.M. (CCH) 1551; T.C.M. (RIA) 88372; August 15, 1988; As amended January 12, 1989 Edwin P. Morrow, pro se. Terry L. Zabel, for the respondent. GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, in a statutory notice of deficiency dated September 16, 1985, determined income tax deficiencies and additions to tax as follows: Addition to Tax
Year
Income Tax
Sec. 6653(a) [1]
1977
$   845.11
$  42.26
1978
28.00
--
1979
61.00
--
1980
2,050.00
102.50
Due to concessions, the only issues remaining for our consideration involve *405 petitioner's lease of the Sha Na Na Sh-Boom master recording. We must decide whether: (1) the leasing activity was engaged in with a profit objective; (2) if so, whether petitioners are entitled to investment tax credits with regard to the master recording lease; and (3) whether petitioners are liable for the increased rate of interest attributable to tax motivated transactions under section 6621(c), I.R.C. 1986. FINDINGS OF FACT Petitioners resided in Middletown, Ohio, at the time they filed their petition in this case. The stipulated facts and exhibits are incorporated herein by this reference. Petitioner, [2] Edwin P. Morrow, has been a financial consultant since 1970. He has no experience or expertise in the area of master recordings or the entertainment field in general. During a trip to New York in late 1980, petitioner met individuals connected with Audio Leasing Corporation (Audio) and Accord Records (Accord) and entered into a master recording lease. A master recording is a tape or other sound conveyance upon which a specific *406 performance has been electronically recorded and which may be used to produce records and tapes for commercial sale. Petitioner leased the master recording for the Sha Na Na Sh-Boom album at issue. Petitioner's interest in the master recording was obtained in connection with the following sequence of events. Apparently, Edan Distributing Corporation obtained the rights to several of the songs on the album from Kama Sutra/Buddah Records (Kama Sutra), the original holder of all Sha Na Na's master recordings. By agreement dated May 23, 1980, Edan Distributing Corporation, sold its interest in the Sha Na Na Sh-Boom master recording to Audio. The purchase price was $ 250,000, payable $ 5,000 cash and a recourse promissory note for the remainder bearing 8-percent interest and due December 31, 1992. Audio was to pay Edan Distributing 50 percent of any gross receipts from exploitation, to be applied toward payment of the promissory note. By Equipment Lease dated December 30, 1980, Audio Leasing Corporation, as lessor, and petitioner and Sondra and Fred Ross (Rosses), as lessees, agreed to lease a one-half interest in a master recording, later designated as the Sha Na Na Sh-Boom album. *407 The term of the lease was for 90 months. Prepaid rental of $ 16,000 was due at the execution of the lease, $ 12,800 allocated to the first year and $ 3,200 allocated to the remaining period. Additional rent was due of 50 percent of the net income received by the lessee from exploitation, not to exceed 50 cents per record. The lessee could not alter or change the recording without the consent of the lessor; thus, the lessees could not license individual tracks separately or add or delete from the recording (reconfigure). The lessor agreed to pass-through the investment tax credit to the lessee under section 38. Audio forwarded the leases for petitioner's signature on February 4, 1981. Petitioner relied on the prospectus supplied by Audio in making his decision to invest in the master recording. The prospectus anticipated sales of 225,000 units in foreign markets, 250,000 units in domestic markets and 85,000 units through licensing and reconfigurations. No substantiation was provided for these figures, except a "generic" appraisal with a blank space left for the master recording name. The prospectus estimated that a $ 16,000 investment made in 1980 could generate $ 33,000 in *408 tax benefits. Petitioner also received an appraisal performed by Richard Gilbert of the Guild for Contemporary Music for the master recording that mirrored the "generic" appraisal in the prospectus. Petitioner did not have an independent appraisal made before investing. He did not listen to the songs on the master recording. He has never taken physical possession of the master recording. The other one-half interest in the master recording was leased to Larry Davis, an investor who was referred to petitioner by Audio. All of the lessees of the master recording, petitioner, Sondra and Fred Ross, and Larry Davis formed the partnership Sha Na Na Leasing. Petitioner owned a 10-percent interest, the Rosses -- 40 percent, and Davis -- 50 percent. The Rosses were friends of petitioner. Fred Ross was an attorney. There is no written partnership agreement for Sha Na Na Leasing. Sha Na Na Leasing conducted no business other than with regard to the Sh-Boom master recording. Petitioner entered into a management agency and distribution agreement with Whittington, Singer, Davis & Co., Inc. (Whittington), to produce and distribute the album. This agreement is undated. Petitioner chose *409 Whittington upon Audio's recommendation. The initial service fee was $ 4,000. In addition, the distribution company was entitled to 60 percent of the gross receipts from the sale of each record as a distribution fee and 15 percent of remainder as a management service fee. [3] This agreement did not have a performance or escape clause requiring the manager to meet certain performance criteria. Such a clause is normal in the industry to safeguard the holder of rights from a manager who does not produce income but continues to control the material. Whittington made arrangements for Accord to manage the Sha Na Na Sh-Boom master recording. The recording was transferred directly from Audio to Accord, whose offices were in the same building in 1980. Accord and Edan Distributing Corporation shared a common president, Michael Guzick (Guzick). Capital Records distributed the album for Accord during the initial period of the lease. Accord distributed $ 308.51 to petitioner in 1982 representing *410 his 10-percent interest in the master recording. This was based on sales of 2,488 units during the latter half of 1981 at a wholesale price of $ 2.48 per album, less 50 percent as Audio's share under the lease agreement. Petitioner has not received any other distributions attributable to the master recording. Whittington sold its distribution agreement for the master recording to Indigo Records in Nashville, Tennessee. Indigo Records has made no effort to market or otherwise distribute the recording. There have been no sales of records produced from the master recording since about 1982. Although petitioner could have obtained a copy of the master recording upon request from Audio, he has not done so. The master recording itself consists of 10 songs ostensibly performed by Sha Na Na. Six of the songs were performed by the group. The remaining four may not have been, as the songs are quasi-religious in character, and the sound does not resemble that of the group. All of the six songs performed by the group have been released on prior albums by Kama Sutra. The quality of the recordings is generally good, although there is some loss of fidelity due to the fact that the recordings *411 are copies several generations away from the original master. Sha Na Na was formed by students at Columbia University in the mid-1960's. They got their first major break when they were booked to perform at the Woodstock festival in 1969. Their humor, costuming and choreography caught on and they became a popular live attraction, both in concert and on a syndicated television series. Their material generally consisted of 1950's and 1960's rock hits originally made famous by other artists. They recorded for Kama Sutra, and their albums were moderately successful, one reaching number 38 on Billboard Magazine's top 200 chart. After 1975, however, none of their albums made the charts. Much of the group's appeal was visual. Thus, while Sha Na Na's syndicated television show was still on the air in 1980, their recordings failed to enjoy the same notoriety. In 1980, Sha Na Na past their peak of popularity; their appeal, if any, was their visual performances, not recordings. The Sh-Boom album, for the most part, contained previously released material. Thus, albums produced from the master recording would be considered budget albums, and would be sold at low prices. The wholesale *412 price of such an album would be approximately $ 2. Less than 3,000 copies of the record could be expected to be sold. The fair market value of the master recording was $ 2,000. The fair market value of the entire leased interest was less than $ 2,000. OPINION The issues in this case surround petitioner's investment in the master recording of the Sha Na Na Sh-Boom album. [4] Respondent, in his notice of deficiency, disallowed all the losses and credits related to petitioner's master recording investment. Petitioners bear the burden of proof on all pertinent items -- profit objective, fair market value, placement in service and others. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a). All claimed deductions and credits are a matter of legislative grace, and must have a basis in the statute. New Colonial Ice Co. v. Helvring,292 U.S. 435 (1934). Section 162 allows a deduction for ordinary and necessary expenses incurred in carrying on a trade or business. Similarly, section 212 allows a deduction *413 for expenses incurred in transactions entered into for profit. The claimed advanced rental payment and management fees must come within these statutory provisions to be deductible. Section 38 allows a credit for investment in certain depreciable property. The credit is allowable on "section 38 property" -- generally tangible personal property which is subject to the allowance for depreciation. Sec. 48(a)(1). Depreciation is allowable on property subject to wear and tear or obsolescence and used in a trade or business or for the production of income. Sec. 167(a). The amount of this credit is limited to the percentage of a taxpayer's qualified investment in section 38 property. Sec. 46(a)(2)(A)(i). Qualified investment is a percentage of basis, and basis is generally cost. Secs. 46(c) and 1011. Under section 48(d), the lessor of property, here Audio, may elect to pass through the credit to the lessee, here petitioner or Sha Na Na Leasing -- the lessee is treated as having acquired the property for its fair market value. The claimed investment tax credits on the Sh-Boom master recording *414 must fit within these provisions. A common threshold for the claimed tax benefits is that the taxpayer must be engaged in a trade or business or in a transaction entered into for profit. Otherwise, no credits are allowed, and deductions may be allowed only to the extent there is income from the activity. Sec. 183. This Court and others have commented on the "profit objective" requirement in many "tax shelter" cases. A representative sample of these cases was summarized in our opinion in Beck v. Commissioner,85 T.C. 557, 569-570 (1985): Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Fuchs v. Commissioner,83 T.C. 79, 98 (1984); Dean v. Commissioner,83 T.C. 56, 74 (1984). While a reasonable expectation of profit is not required, petitioner's objective of making a profit must be bona fide. Fox v. Commissioner,80 T.C. 972, 1006 (1983), affd. * * *. "Profit" in this context means economic profit, *415 independent of tax savings. Herrick v. Commissioner, [85 T.C. 237, 254 (1985)]; Surloff v. Commissioner,81 T.C. 210, 233 (1983). Whether petitioner possessed the requisite profit objective is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985) [affd. 782 F.2d 1027 (3d Cir. 1986)], and cases cited therein. Although no one factor is determinative, greater weight must be given to objective facts than to petitioner's mere statement of his intent. Siegel v. Commissioner,78 T.C. 659, 699 (1982); Engdahl v. Commissioner,72 T.C. 659, 666 (1979); sec. 1.183-2, Income Tax Regs. * * * [Fn. ref. omitted.] There is abundant evidence in this case that tax considerations, not economic profit, dictated the master recording lease. In a "typical" abusive tax shelter, there is a purported transfer of ownership at greatly inflated prices, with the acquisition financed by nonrecourse debt, enabling the investor to claim the inflated depreciation deductions and investment tax *416 credits. The fair market value of the underlying asset could not conceivably support the purchase price and the nonrecourse and/or contingent debt virtually assures that the price will not be paid. Thus, our opinions have focused on the fair market value of the property and character of financing in an attempt to evaluate profit objective. See cases summarized in Rose v. Commissioner,88 T.C. 386, 412-414 (1987). Because petitioner held a leasehold interest, fair market value of the master recording is not, in and of itself, a good indicator of the economic viability of the venture. In such cases, we have used a projected cash flow analysis to determine whether the transaction realistically had any possibility for economic profit. See Soriano v. Commissioner,90 T.C. 44 (1988). This is analogous to the fair market value inquiry in other "tax shelter" cases and, in effect, is a determination of the fair market value of the leased interest. Profit means economic profit, independent of tax savings. Herrick v. Commissioner,85 T.C. 237 (1985); Surloff v. Commissioner,81 T.C. 210 (1983). Thus, analysis of *417 expected cash flow to the lessee, disregarding tax consequences, provides a good indicator of the possibility for economic profit. The lessee in this transaction expected to receive the distributor's wholesale price less the 60-percent distribution fee. This amount would then be reduced by the 15-percent management fee. The lessee is entitled to 50 percent of the remainder due to the 50-percent rental payment. For simplicity, we will base our figures on ownership of an entire leasehold interest rather than petitioner's fractional (10 percent) interest. Using petitioner's wholesale price of $ 2.48 per record, an assumption highly favorable to petitioner, the lessee could anticipate income of approximately 42 cents per record sold. [5] In order to recoup the initial investment of $ 20,000 ($ 16,000 prepaid rental and $ 4,000 management fee) would require sales of over 47,600 records. Even if we assume petitioner was entitled to the entire $ 2.48, which clearly was not the agreement, sales of over 8,000 records would be required to break even. "[Petitioner] may not now choose without substantiation * * * a favorable sales projection to rationalize post hoc the purported profit *418 potential of his venture." Estate of Baron v. Commissioner,798 F.2d 65, 73 (2d Cir. 1986), affg. 83 T.C. 542 (1984). Respondent's expert testified the Sh-Boom album could expect a maximum of 3,000 record sales. [6] We found respondent's expert witness to be credible and knowledgable. His professional specialization involves music of the Sha Na Na era and he has considerable experience in the recording industry. On the other hand, the expert report relied on by petitioner was prepared by an individual specializing in country music. Moreover, the expert report relied upon *419 by petitioner projected a maximum of 50,000 in sales, which would only produce a return of slightly less than 1 percent per year over the 7 1/2-year (90 month) term of the investment. Thus, this situation is analogous to cases in this Court holding that a grossly inflated purchase price indicates indifference towards economic profit. Fox v. Commissioner,80 T.C. 972 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Kratsa v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Leffel v. Commissioner,734 F.2d 6 (3d Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner,734 F.2d 5 (3d Cir. 1984); Flowers v. Commissioner,80 T.C. 914 (1983). *420 There are also a number of other indicia of the lack of a profit objective. In cases involving purported transfers of assets, the lack of an independent appraisal is highly indicative of indifference to economic profit. Analogously, petitioner has not shown that he obtained any kind of independent cash flow analysis or sales projections. Where the taxpayer is inexperienced in the area, some independent indicator of profitability would be a most probative element in any finding of a genuine profit motive. Cf. cases involving appraisals, Beck v. Commissioner,85 T.C. 557, 572 (1985); Elliott v. Commissioner,84 T.C. 227, 240 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); Fox v. Commissioner, supra.See also Brannen v. Commissioner,78 T.C. 471, 508 (1982), affd. 722 F.2d 695 (11th Cir. 1984). It was not shown that petitioner had any expertise in the master recording business. Petitioner did not listen to the album before investing, nor has he ever obtained possession of the tape. We also find it relevant that there was no performance clause in the management *421 agreement, thus petitioner was stuck if the management company refused for any reason to market the albums. In addition, despite lack of sales, he has not attempted to force action on the part of the management company. Assuming petitioner understood these terms, it is difficult to imagine that he had an interest in anything other than the proposed tax benefits. The transactional records are also suspect. While the partnership Sha Na Na Leasing was supposed to be the owner of the recording, the documentation is solely in petitioner's (and the Rosses) name. This also appears to be the case with the management agreement. As a general matter, there appears to be no purpose for the partnership at all. There was no written partnership agreement, and Larry Davis rarely spoke to petitioner. The one distribution was sent to petitioner, not Sha Na Na Leasing. The transaction was not undertaken in a business like manner. See section 1.183-2(b)(1)-(3), Income Tax Regs.
The prospectus focused mainly on the tax benefits of the transaction, and made no realistic (or substantiated) economic projections. Although petitioner did receive one small distribution, it was not shown that the *422 record was otherwise profitable. See section 1.183-2(b)(6), Income Tax Regs.
In sum, we find that petitioner did not have a profit objective in relation to the master recording activity, and thus, respondent's disallowance of the losses and investment tax credits is sustained. There are other reasons why the claimed investment tax credits must fail. Credits are passed from lessor to lessee as if the lessee had acquired the property at a price equal to fair market value. Sec. 48(d)(1)(A). While the lessee need not independently qualify for investment tax credits under sections other than 48(d), i.e., sec. 46(e)(3), 46(c)(8), Faulkner v. Commissioner,88 T.C. 623 (1987), it is clear that shortcomings or defects in the lessor's qualifications under sec. 48(d) would limit the lessor's ability to pass through the credits to the lessee. Petitioner has not introduced any evidence to support a $ 250,000 fair market value for the master recording, a fact in dispute. Thus, even if profit objective could be established, petitioner has not established the fair market value of the master recording, and would not be entitled to the investment *423 tax credit in the amount taken. There are other restrictions on the credit pass-through. The property must be new section 38 property in the hands of the lessor and the lessee must be the original user of the property. Sec. 48(b), (d); Sec. 1.48-4(a)(1), Income Tax Regs. In the circumstances of this case, it is doubtful that reconfiguring of previously released material constitutes an original use by petitioner. The lessee is not considered to be the original user of property if it has been previously used by the lessor or another person or if it is reconstructed or rebuilt or reconditioned property. Sec. 1.48-4(b), Income Tax Regs.
There is also some doubt as to whether the property could have been placed in service in 1980. The investment credit is allowed in the year in which qualifying property is placed in service by the taxpayer. Sections 38 and 46. Property is placed in service when it is placed in a condition of readiness or availability for a specifically assigned function. Secs. 1.46-3(d)(1)(ii), 1.167-11(e)(1)(i), Income Tax Regs. Petitioner could not have executed the lease agreements, or obtained title, *424 until after February 4, 1981. In addition, it is unclear when the recording was first placed with a party who could make records. Thus, petitioner is not entitled to any losses or credits related to the lease of the Sha Na Na Sh-Boom album. This transaction possesses the usual hallmarks of economic distortion to achieve tax benefits. See Cherin v. Commissioner,89 T.C. 986 (1987). We cannot ignore the fact that petitioner received tax credits equaling 125 percent of his total cash investment based upon the alleged value of the underlying asset, and that he had no further apparent economic obligations. Petitioner claimed losses and credits based upon hyperinflated values that he did not take time to independently verify. The prepaid rental exceeded the value of the entire master recording. Moreover, the entire leasing activity was driven by tax, not economic profit, motivations. Therefore, respondent's determination on the section 6653(a) negligence addition is sustained. The final issue is the interest imposed on tax motivated transactions imposed by section 6621(c). [7] The increased rate of interest is 120 percent of the statutory rate imposed on underpayments. *425 Sec. 6621(c)(1). A tax motivated transaction includes any valuation overstatement (as defined in section 6659) and any sham or fraudulent transaction. Sec. 6621(c)(3)(A)(i), (v). We have defined sham or fraudulent transaction to include transactions where the taxpayer lacked profit motive and which were without economic substance. Patin v. Commissioner,88 T.C. 1086, 1128-1129 (1987). In addition, the Commissioner has the authority to specify types of transactions that will be treated as tax motivated. Sec. 6621(c)(3)(B). Deductions disallowed for any period under section 183 relating to an activity not engaged in for profit are included in respondent's temporary regulations. Sec. 301.6621-2T Q-4, Temp. Proced. and Admin. Regs., 49 Fed. Reg. 59394 (Dec. 28, 1984). We have previously disallowed the advanced rental deductions, management fee deductions and investment tax credits related to the master recording lease activity because it was not engaged in with the requisite profit objective. Thus, the increased rate of interest applies to these items. Soriano v. Commissioner,90 T.C. 44 (1988); Cherin v. Commissioner, supra; *426 Patin v. Commissioner, supra.[8]
To reflect concessions of the parties, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Hereinafter, petitioner, when referred to in the singular, refers only to petitioner Edwin P. Morrow. ↩
3. The agreement is ambiguous as to whether the 15 percent is of gross receipts or of petitioners' remaining 40 percent. This difference is not critical and does not affect the outcome. ↩
4. Although the parties were requested to file simultaneous briefs, petitioners failed to file any briefs, as required by Rule 151. ↩
5. The lessee's share after 60-percent distribution fee ($ 2.48 X 40 percent) equals $ 0.99. The lessee's share after 15-percent management fee ($ 0.99. The lessee's share after 15-percent management fee ($ 0.99 X 85 percent) equals $ 0.84. The lessee's share after 50-percent rental payment ($ 0.84 X 50 percent) equals $ 0.42. As previously indicated, in note 3, supra,↩ the agreement is ambiguous as to whether the management fee is 15 percent of the remainder or 15 percent of gross receipts. We use 15 percent of the remainder, a figure more favorable to petitioner. 6. Petitioner attempted to introduce a document showing sales of 5,000 copies of the record. This document was inadmissible hearsay. Moreover, we are inclined to believe the theory of respondent's expert that accord reported token sales and made minimal distributions in order to avoid scrutiny. ↩
7. Prior to the Tax Reform Act of 1986 subsec. (c) was designated subsec. (d). Sec. 1511(a), Pub. L. 99-514, 100 Stat. 2085, 2744. The additional interest applies after Dec. 31, 1984, and notwithstanding that the transaction was entered into prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. per curiam without published opinion 795 F.2d 1005↩ (2d Cir. 1986). 8. Alternately, petitioner claimed the tax credits based on the valuation of the master recording at $ 250,000. There is a valuation overstatement if the value of property claimed on any return is more than 150 percent of the amount determined to be the correct amount. Sec. 6659(c). We determined the correct value of the master recording to be $ 2,000. Thus, sections 6621(c)(1) and (3)(A)(i)↩ would apply to the disallowed credits.