WILLIAM W. AND MARION E. HOWARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Howard v. Commissioner
Docket No. 2169-85.
United States Tax Court
T.C. Memo 1988-148; 1988 Tax Ct. Memo LEXIS 176; 55 T.C.M. (CCH) 575; T.C.M. (RIA) 88148; April 11, 1988. Randy C. Irvine, for the petitioners. Janice M. Fallman, for the respondent. PARR
MEMORANDUM OPINION PARR, Judge: By his notice of deficiency dated October 26, 1984, respondent determined a deficiency in petitioners' income tax for 1980 in the amount of $ 11,165.75 and an addition to tax under section 6651(a) [1] in the amount of $ 1,570.19. By amended answer respondent alleges an increased deficiency of $ 700 and an increased section 6651(a) addition of $ 175. *177 After mutual concessions, the issue for decision is whether petitioners are entitled to deductions and an investment tax credit in connection with their drag racing activities. FINDINGS OF FACT Petitioners are husband and wife who resided in Elk Grove, California, when they filed their petition. William Howard was employed full time during 1980 as an electronic repairman at the U.S. Army Depot in Sacramento, California, and Marion Howard worked as a clerk full time at Montgomery Ward in Sacramento. Petitioners filed their 1980 income tax return on September 24, 1982. Petitioners reported their income and expenses on a cash basis. Petitioners combined gross incomes and losses claimed for the years 1976 through 1982 approximated: Year
Income
Racing Loss Claimed
1976
$ 26,942.00
($  5,823.00)
1977
29,520.00
( 12,692.00)
1978
35,972.00
( 23,590.00)
1979
39,007.00
( 18,246.00 1980
41,224.00
( 19,604.00)
1981
42,000.00
( 11,332.00)
1982
44,264.00
( 17,390.00)
From 1976 through 1984 both petitioners were employed full time and their combined gross income was derived from their respective employments and oil well income. During *178 the year in issue petitioners reported no income from their drag racing activities. They claimed expenses of $ 19,684 and a $ 700 investment tax credit (ITC) attributable to these activities. Between 1976, when petitioners first claimed losses related to drag racing, and 1982, they won only $ 140 from drag racing: $ 75 in 1976 and $ 65 in 1979. Over the same period of time petitioners deducted $ 108,757 in losses from this activity. William Howard (hereinafter referred as petitioner) was mechanically inclined since his youth, and, in 1946, was part owner of a service station with his brother. He provided engine repairs and overhauls, but did not build racing engines. Petitioner began racing cards in 1946 or 1947 in San Jose, California. During that period he participated in ten to fifteen races, but did not own any of the vehicles he raced. From 1948 to 1975 petitioner did not engage in any automobile racing. In 1975 he purchased and began racing a 1970 Barracuda. Petitioner was licensed to drive in the superstock class by the National Hotrod Association (NHRA) from 1975 to 1984, when he allowed his NHRA license to expire. Petitioner entered 136 races between April 19, 1975 and *179 May 6, 1984. Petitioner's son-in-law, Zeke Townsend, was the driver in most of the races petitioner entered starting in 1976. In 1980 Townsend drove in more than 75 percent of the races petitioner entered. [2]
Petitioner could earn money for auto racing in three ways: (1) prizes awarded for winning, placing or showing in the races; (2) contingency prize money paid to drivers according to points accumulated over the racing season; and (3) commercial sponsor's support. In addition, racers could receive free merchandise such as oil, gasoline, filters, etc., for displaying a particular manufacturer's decal on the racer's car. When the NHRA "sponsors" or "promotes" a national, regional or divisional event, it provides the prize money and contingent prize money. NHRA also awards points to the various winners in each classification of racers toward NHRA championships. Points determine the championship in each racing category. Points are not carried over from one year to the next. Sanctioning of a race by NHRA means a local raceway *180 has met certain safety and insurance requirements. Prize money for NHRA sanctioned races promoted by local raceways generally depends upon fees of entrants racing within a specific NHRA classification. Local raceways, not NHRA, provide the prize money for NHRA sanctioned events that are not sponsored or promoted by NHRA. Contingent prize money in NHRA sponsored or promoted events is divided among all subclassifications of racers in a specific event, including the NHRA designated "professional" classifications and the NHRA "sportsman" classifications. Prize money in sponsored or promoted events is more heavily weighted for distribution to the professional classifications, such as "funny" cars and top fuel cars, than to the sportsman classifications such as the "superstock" classification (petitioner's class). Competing manufacturers of the same racing products or services, such as Valvoline and Pennzoil, often provide promotional money which NHRA distributes as part of the contingent prize money in sponsored or promoted events. To win prize money from a product sponsor, the racer must do two things: (1) he must have entered and won an NHRA sponsored event; and (2) he must have *181 affixed the decal of the sponsored product to the vehicle and have used the product during the event. Manufacturers occasionally award products (as opposed to money) to racing entrants who merely show up at NHRA sanctioned local races. Sometimes, however, the entrant is required to win the local event before the sponsor will provide the free product. Petitioner's race car bore decals provided by merchandisers of race car goods and services. Petitioner's race car bore a decal from Rex Hutchison's Racing Engines, for which petitioner received a discount on race car parts. Hutchison never provided an outright cash sponsorship to petitioner. Hutchison did not provide petitioner with any discount for labor such as engine machining. He did not require petitioner to enter any specific races or minimum number of races in order to obtain thisdiscount. If petitioner did not purchase any parts from Hutchison, Hutchison provided no other form of financial assistance to petitioner for his racing activities. Petitioner tried to obtain Coca Cola and Valvoline corporate sponsorships, but he was not successful. Commercial sponsorships could have reduced his racing costs through free *182 merchandise or cash expense subsidies. For instance, petitioner believed Valvoline would have given him oil, grease, and gas for a year, and that Coca Cola might have painted his car (with their advertisements). He also hoped they might provide a monthly expense allowance for running the car. Sponsors did not pay a salary or stipend. From 1975 to 1980 superstock prize money remained unchanged while auto racing expenses increased roughly by 400 percent. These conditions were a result of the nation's economy, due in part to the energy crisis, and the failure of car manufacturers to promote auto racing as in the past. Manufacturers concentrated their promotional efforts on fuel efficient, compact, and mid-size vehicles and stopped sponsoring high performance cars that burned a lot of gas. Petitioner and his son-in-law, Townsend, had an oral agreement to split any winnings that might be earned by Townsend driving petitioner's car. However, Mr. Townsend did not pay for any of the expense incurred in connection with petitioner's racing activities nor did Townsend own any interest in the assets for which petitioners have claimed depreciation on their 1980 return. Petitioner *183 and Townsend entered petitioner's car in the following races during 1980. The total prize money offered for first, second, and third place is set forth below: First
Second
Third
Dates (1980)
Racetrack
Place
Place
Place
2-23 & 2-24
Sacramento
$   200.00
$   100.00
$   40.00
2-29 * &
Bakersfield
600.00
300.00
200.00
3-1 & 3-2
3-30
Sacramento
100.00
50.00
25.00
4-13
Sacramento
100.00
50.00
25.00
4-19 & 4-20
Fremont
400.00
300.00
100.00
5-24
Sacramento
100.00
50.00
25.00
6-21 & 6-22
Sacramento
400.00
300.00
100.00
8-8 * & 8-9
Sacramento
100.00
50.00
25.00
8-16 & 8-17
Sacramento
200.00
100.00
40.00
9-14
Sacramento
150.00
75.00
30.00
11-2
Sacramento
150.00
75.00
30.00
Total
$ 2,500.00
$ 1,450.00
$ 640.00
Neither petitioner nor Townsend placed in any race entered during 1980, nor did they win any prize money. After 1982, neither petitioner nor Townsend drove petitioner's car in races. When petitioner himself was driving, Mrs. Howard and Townsend served *184 as his pit crew. When Townsend was driving, petitioner served in the pit crew. Sometimes petitioner's son, William, and married daughter, Patricia Townsend, would assist at the track events. Petitioner primarily raced at Sacramento Raceway, located about 10 miles from petitioner's residence. Except for the 1980 races at the Sacramento Raceway on June 21 and 22, all other races petitioner entered in Sacramento during 1980 were not NHRA sponsored or promoted races. Therefore, the purses were determined solely by the operator of the local track. Since 1975 petitioner has raced in NHRA sponsored or promoted races in Bakersfield, Pomona, Fremont, and Sacramento, California. Except for NHRA sponsored or promoted events in Fremont, Bakersfield, and Sacramento, none of the other races petitioner entered during 1980 afforded him the ability to earn contingent prize money or cash prizes other than the amounts funded by the local raceway operator for persons placing first, second or third in a race. Petitioner consulted with numerous drivers and mechanics in auto racing and on many occasions regarding mechanical specifications and tolerances to assist petitioner in his efforts to *185 improve his car's performance. Petitioner usually followed the advice given. He committed most weekends and some time during the week to his auto racing activities. Friends and relatives volunteered assistance to petitioner, but he had no paid employees. Petitioner maintained sketchy notes in spiral notebooks concerning consultations with auto racing authorities; modifications made to engines, transmissions, and auto body; experiments on racing engines; costs of equipment and parts; tolerances; and dimensions. In 1978 or 1979 petitioners maintained a checking account in the name of Bill Howard Enterprises at First Security Bank in Elk Grove, California. Funds deposited to that account consisted of petitioners' salaries and oil well royalties. The account was also used to pay personal and oil well expenses and to repay money petitioners borrowed from other individuals. Petitioners also wrote checks to cash for spending money on this account. Mr. Howard was the only authorized signatory on the account. Petitioners also maintained a joint checking account at Bank of America, Elk Grove, California, from which they also used funds for racing. Both petitioners had signature *186 authority. When Mrs. Howard wrote checks from the Bank of America joint account to pay for racing expenses, Mr. Howard would write a check on the Bill Howard Enterprise account to reimburse her. Mrs. Howard's involvement in auto racing consisted of keeping the books of account, helping in the pits, and running errands for her husband. She maintained annual expense ledgers for 1975 or 1976 through 1984 in a three-hold special notebook and a spiral stenographer's notepad, and summarized the racing income and expenses at the end of each calendar year. The entries made in the annual expense ledgers were not contemporaneously made but generally were entered into the notebook and notepad at the end of each year. Petitioners did not formally retain records of the actual prize money, contingent prize money, championship points or free products offered by sponsors for any of the races they entered. ULTIMATE FINDING OF FACT Petitioners did not engage in drag racing during 1980 with a bona fide objective of making a profit. OPINION Petitioners bear the burden of establishing the propriety of the deductions claimed. Welch v. Helvering,290 U.S. 111 (1930); Rule *187 142(a). Because the ITC issue was first raised by amended answer, respondent bears the burden of proof with regard to that issue. Rule 142(a). The threshold for obtaining the claimed tax benefits is that the taxpayer must be engaged in a trade or business or in a transaction entered into for profit. Otherwise, no credits are allowed, and deductions may be allowed only to the extent there is income from the activity (here, zero). Section 183. Essential to such a showing is a demonstration that petitioner had "an actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 646 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Whether petitioner possessed the requisite profit objectives is a question of fact to be resolved on the basis of all the facts and circumstances. Elliott v. Commissioner,84 T.C. 227, 236 (1985), affd. 782 F.2d 1027 (3d Cir. 1986); Golanty v. Commissioner,72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Although no one factor is determinative, greater weight must be given to objective facts *188 than to petitioner's mere statement of his intent. Dreicer v. Commissioner,78 T.C. at 645; Siegel v. Commissioner,78 T.C. 659, 699 (1982); section 1.183-2, Income Tax Regs.
There is abundant evidence in this case that petitioner's drag racing activities were entered into for recreational pleasure and not for profit. First, we note that from 1976 through 1982, the period over which petitioners claimed to be in the business of drag racing, they never showed a profit. In fact, they won a total of only $ 140 but claimed losses from this activity of $ 108,757. Second, petitioners' lack of profit motive is amply demonstrated by the fact that the total purses for first place in all races entered in 1980 came to only $ 2,500. This was their potential earnings (aside from possible discounts on products or assistance with expenses which they hoped to obtain from manufacturers, which might have reduced their costs but would not have provided positive income). Even this amount was to be split 50/50 with Townsend on 75 percent of the races. Thus, petitioners' best efforts could have produced at most $ 1,562.50 ($ 2,500 x .25 plus $ 2,500 x . *189 75 divided by 2). In light of the fact that prior year's losses had ranged from a low of $ 5,823 in 1976 to $ 23,590 in 1978, it defies belief that petitioners had an honest and bona fide objective of making a profit from this activity in 1980. Nor are we persuaded by petitioners' allegations that the racing losses are attributable to depressed market conditions. Petitioner testified that car manufacturers lost interest in "muscle cars" like his because they were unmarketable, but that they continued to provide sponsorship money for consumer-demanded economy cars. However, petitioners knowingly continued to use obsolete equipment with static prize money while experiencing ever increasing operating costs. Petitioners' loose handling of their racing bank account is yet another indication that they pursued their racing activity for personal pleasure and not for profit. Respondent is sustained on his disallowance of deductions and the ITC in connection with petitioner's racing activities. To reflect mutual concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended, and in effect during the years in issue. Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Future references to "races petitioner entered" shall refer to races in which Mr. Townsend drove as well as races in which petitioner drove. ↩
*. Except for these two Fridays, all other races petitioner entered were either on Saturday or Sunday. ↩