PAUL E. AND MARGARITA LAPINEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lapinel v. Commissioner
Docket No. 19465-86
United States Tax Court
T.C. Memo 1989-685; 1989 Tax Ct. Memo LEXIS 685; 58 T.C.M. (CCH) 1087; T.C.M. (RIA) 89685; December 28, 1989
*685 Ps were engaged in a horse-breeding activity. Ps incurred losses in the activity for 21 consecutive years. Held, Ps did not engage in the activity for profit within the meaning of I.R.C. section 183(a). B. Paul Husband and Michael R. Morris, for the petitioners. Ellen J. Mechlin and Ronald Lewis, for the respondent. NIMS
MEMORANDUM FINDINGS OF FACT AND OPINION NIMS, Chief Judge: Respondent determined the following deficiency in and additions to petitioners' Federal income tax for 1981: Additions to Tax
Deficiency
Sec. 6651(a)(1)
Sec. 6653(a)(1)
Sec. 6653(a)(2)
$ 23,118.00
$ 3,672.00
$ 1,867.00
50% of interest
on $ 37,331.00
*687 (Unless otherwise indicated, all section references are to sections of the Internal Revenue Code in effect for 1981. All Rule references are to the Tax Court Rules of Practice and Procedure.) After concessions, the issue for decision is whether petitioners were engaged in horse breeding for profit within the meaning of section 183(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners were married and filed a joint Federal income tax return for 1981. At the time of filing their petition, petitioners resided in New York, New York. In 1962, petitioners, while living in New York City, purchased a farm, 150 miles away, in Bovina, New York. They built a stable on the farm in 1964. In 1967, petitioners decided to use the farm for breeding and raising Arabian horses. Petitioners' initial investment in the horse-breeding activity (the activity) was as follows: Investment
Amount
Land
$  6,000
Indrop (Stallion)
1,100
Fasha (Mare)
3,300
Fersal and Khalahti (Mare and Colt)
2,500
Jadi Bravo (Mare)
3,500
Building materials for stable
2,000
Trailer
1,400
Total
$ 19,800
*688 Petitioners carried on the activity from 1967 to 1987. The activity generated a loss during each and every one of its 21 years in operation. The following is a breakdown of the deductions taken, income earned and losses generated from the activity and petitioners' taxable income (excluding the loss from the activity) from 1969 to 1986: Taxable
Year
Deductions
Income
Loss
Income
1969
$   9,777.23
-0-  $   9,777.23
$ 33,038
1970
8,692.18
$     50.00
8,642.18
30,126
1971
6,474.29
505.00
5,969.29
29,807
1972
6,259.53
575.00
5,684.53
26,955
1973
9,347.89
375.00
8,972.89
N/A 1974
13,918.23
550.00
13,368.23
35,854
1975
9,168.72
850.00
8,318.72
48,903
1976
9,879.24
1,750.00
8,129.24
42,906
1977
12,114.00
750.00
11,364.00
52,660
1978
12,896.00
-0-  12,896.00
43,701
1979
13,833.00
-0-  13,833.00
59,600
1980
N/A  N/A  N/A  N/A 1981
29,999.00
700.00
29,299.00
78,998
1982
17,860.00
2,500.00
15,360.00
62,462
1983
26,742.00
-0-  26,742.00
92,691
1984
21,735.00
-0-  21,735.00
84,940
1985
22,152.00
3,600.00
18,552.00
78,200
1986
27,729.00
-0-  27,729.00
70,460
TOTAL
$ 258,577.31
$ 12,205.00
$ 246,372.31
*689 (In the above table we use N/A to mean not available.) Despite 21 years of losses, petitioners have never considered abandoning the activity. Petitioners would not have been able to maintain this activity if they did not have income from other sources. From 1967 to 1987, petitioner Paul Lapinel (Paul), a psychiatrist, was employed on a full-time basis by New York University. He also worked as a consultant in his own consulting practice during 1981. In 1981, petitioner Margarita Lapinel was employed on a full-time basis by New York University. From 1967 to 1987, petitioners earned substantial amounts of taxable income and deducted in full the losses generated by the activity, thus reducing their taxable income in each year. Petitioners had never owned or operated a horse farm before starting the activity. During his youth, Paul occasionally worked on a horse farm owned by his uncle. Margarita had no prior experience with the management or breeding of horses. In 1967, Margarita attended a three-day Stud Managers Course in Lexington, Kentucky. In 1968, petitioners attended a two-day horse management course in Huntsville, Alabama. They also attended a seminar on horse *690 management in 1986. Petitioners subscribed to a number of horse periodicals during the years they carried on the activity. Margarita had primary responsibility for managing the activity. During the summer months, she lived on the farm and Paul would usually visit the farm on weekends. The physical labor needed to operate the farm during the summer months was provided by family members. In 1969 and 1975, petitioners hired a professional trainer on a part-time basis to train their horses with the aim of making the horses more valuable. During the winter months, petitioners employed a person to feed the horses. The employee was not trained to manage horses and would spend approximately an hour each day feeding the horses. Petitioners paid the activity's expenses with checks drawn on their personal checking accounts. They retained the cancelled checks to substantiate the deductions claimed for the activity. Petitioners did not maintain any journals or ledgers or prepare budgets or income forecasts for the activity. Petitioners purchased horses for the activity from established breeders without written contracts. Petitioners kept track of the foaling dates, breeding dates *691 and other horse activities by making notes on calendars. During the first 15 years of operation, petitioners did not retain any written records documenting the sale of horses from the activity. Petitioners owned approximately 20 horses during each year of operation. Petitioners purchased insurance on the horses as follows: No. of
Year
Horses Insured
1969
3
1974
1
1987
1
In 1977, the stable and two horses were destroyed in a fire. Petitioners did not carry insurance on the stable or horses destroyed in the fire. They did, however, carry insurance on the new stable that was built after the fire. Petitioners primarily advertised their horses by means of classified advertising, posting circulars in feed stores and through correspondence with other breeders. They deducted a total of $ 1,009.73 for advertising expenses from 1969 to 1986. From 1969 to 1986, the annual advertising expense deduction from the activity never exceeded $ 300, and in many years no advertising expense was incurred. Petitioners exhibited their horses at local horse shows about once a year. Between 1976 and 1982, petitioners went from having both part-bred and pure-bred Arabian *692 horses to having only pure-bred Arabian horses. Petitioners knew in 1967 that part-bred Arabian horses were not as valuable as pure-bred Arabians horses. However, they could not afford to purchase only pure-bred Arabian horses initially. Gary Robert Marks, a real estate appraiser, estimated that the farm (land and buildings) had a fair market value of $ 125,000 in 1987. The farm is located near a ski resort and is in an area known for its hunting, fishing and hiking. The farm appreciated in value because residents of New York City considered the area to be a good location for country homes. Mr. Maroney, an Arabian horse expert, estimated that the horses on petitioners' farm in 1987 were worth a total of $ 137,500 if sold individually or $ 120,000 if sold as a group. The highest price that petitioners have received for a horse is $ 3,000. Mr. Tomasulo, an expert on market conditions in the Arabian horse industry, testified that the market for Arabian horses peaked in 1982 and 1983 and has been in drastic decline in the last two or three years. He also stated that not many of the investors he has dealt with since 1976 have made money and that at this point in time every one *693 of his investors would "get out in ten minutes" if given the opportunity. Respondent determined that petitioners were not entitled to deduct the $ 29,299 net loss arising from the horse-breeding activity in 1981 because they were not engaged in the activity for profit. OPINION As a general rule, individuals are not allowed to deduct losses attributable to an activity not engaged in for profit. Sec. 183(a). Section 183(b)(2) provides, however, that deductions are allowed from an activity not engaged in for profit to the extent of gross income generated by the activity. Respondent asserts that petitioners were not engaged in the horse-breeding activity for profit. Thus, deductions attributable to the activity should be disallowed to the extent that they exceeded gross income generated by the activity. Petitioners contend that they were engaged in horse breeding for profit and, thus, their loss should be fully deductible. We agree with respondent. Section 183(c) defines an activity not *694 engaged in for profit as an "activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." A taxpayer must engage in an activity with the objective of making a profit in order to fully deduct expenses under either section 162 or section 212. Golanty v. Commissioner, 72 T.C. 411, 425 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioners do not need to establish that their expectation of profit was reasonable provided they had the "actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 644-645 (1982), affd. without opinion (D.C. Cir. 1983). Whether a taxpayer engaged in an activity with the requisite objective of making a profit is one of fact to be resolved on the basis of all the surrounding facts and circumstances. Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981). In making this determination, more weight is accorded to objective facts than to the taxpayer's mere statement of intent. Sec. 1.183-2(a), Income Tax Regs. The burden of *695 proving the requisite objective is on petitioners. Sabelis v. Commissioner, 37 T.C. 1058, 1062 (1962); Rule 142(a). Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors, which are in large part a synthesis of prior case law, to be considered in determining whether an activity is engaged in for profit. Benz v. Commissioner, 63 T.C. 375, 382-383 (1974). These factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is controlling. *696 Rather, the facts and circumstances of the case taken as whole are determinative. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); sec. 1.183-2(b), Income Tax Regs.
In the present case, the facts and circumstances show that petitioners were not engaged in horse breeding for profit. Petitioners incurred losses as horse breeders for 21 consecutive years. The amount of loss incurred each year generally increased from the amount of loss incurred in each preceding year. In spite of these losses, petitioners never considered abandoning the activity. They have been able to use the activity's losses, year after year, to reduce the substantial amounts of income that Paul has earned as a psychiatrist. This pattern of activity shows that petitioners were not engaged in the activity for profit. Golanty v. Commissioner, supra at 426-427. Petitioners, however, claim that the reason the activity did not become profitable was because of a fire in 1977. The fire cannot begin to explain why losses were consistently incurred before and after the fire. The stable that was destroyed was built with $ 2,000 of materials, and *697 no individual horse has ever been sold by petitioners for more than $ 3,000. Thus, at most, the loss of the stable and two horses in the fire caused only $ 8,000 in damages. Yet, the activity's net loss for 1981 alone, not to mention the other years, was almost $ 30,000. Moreover, had the activity been operated in a business-like manner, the barn and horses would have been insured. Petitioners next contend that the profit they were seeking from the activity was from the unrealized appreciation in the farm and horses, not from operating profits. See sec. 1.183-2(b)(4), Income Tax Regs. Petitioners' horse-breeding activity had no economic interrelationship with the holding of land for appreciation. Sec. 1.183-1(d)(1), Income Tax Regs. In fact, the substantial losses incurred by activity were an unnecessary economic burden to the holding of the land for appreciation. See Boddy v. Commissioner, T.C. Memo. 1984-156, affd. without published opinion 756 F.2d 884 (11th Cir. 1985). An unsuccessful horse-breeding *698 operation cannot be carried on forever simply because the price of land in that general area is rising. See Jasionowski v. Commissioner, 66 T.C. 312, 323 (1976). Thus, the holding of the farm for appreciation and the carrying on of a horse-breeding operation are two separate activities. Sec. 1.183-1(d)(1), Income Tax Regs. As such, any appreciation attributable to the land is not relevant in determining whether petitioners engaged in the horse-breeding activity for profit. Assuming petitioners were able to sell the horses for their appraised value of $ 137,500, they would still not recover the $ 246,372.31 of aggregate losses incurred in the activity from 1969 to 1986. Thus, the unrealized appreciation in the horses does not show that petitioners were engaged in the activity for profit. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). Petitioners further assert that their shift to all pure-bred Arabian horses between 1976-1982 shows that they were engaging in the activity for profit because they were changing their operations to become more profitable. See *699 sec. 1.183-2(b)(1), Income Tax Regs. The shift in focus from part-bred and pure-bred Arabian horses to only pure-bred Arabian horses was contemplated at the time petitioners initiated the activity. Petitioners were unable to afford the expense of buying only pure-bred Arabian horses in 1967. Thus, the shift to pure-bred Arabian horses between 1976 and 1982 was not done as a strategy to stem losses from the activity. Even after shifting to pure-bred Arabian horses, the activity continued to generate substantial losses. The activity was operated, as most hobbies are, on a relatively informal basis. Petitioners kept their cancelled checks but did not prepare any books. They carried practically no insurance on the horses and hired professional trainers in only two of 21 years in operation. While they were away in the winter months, petitioners hired untrained part-time employees to feed the horses. They only advertised in years when they wanted to sell a horse and never spent more than a few hundred dollars a year on advertisements. Petitioners no doubt derived substantial personal pleasure from raising horses on their farm. The farm was located near *700 a ski resort and the area was well known for its fishing, hunting and hiking. During the summer months, petitioners would leave New York City and go to the farm to enjoy the country and raise their horses. We have no doubt that petitioners worked very hard in the horse-breeding activity. However, even a hobby can require considerable work. Considering all the facts and circumstances, we find that petitioners did not engage in the horse-breeding activity with the objective of making a profit. Accordingly, we hold that deductions from the activity are limited to the income generated by the activity. Sec. 183(b)(2). Respondent concedes that the additions to tax under sections 6651(a)(1), 6653(a)(1) and 6653(a)(2) are not applicable. To reflect the foregoing, Decision will be entered under Rule 155.