JAMES J. AND BARBARA E. JASIENSKI, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Jasienski v. Commissioner
Docket No. 25126-90
United States Tax Court
T.C. Memo 1992-674; 1992 Tax Ct. Memo LEXIS 718; 64 T.C.M. (CCH) 1369; November 23, 1992, Filed *718 Decision will be entered for petitioners. For Petitioners: Jack A. Weinstein. For Respondent: Timothy S. Murphy and Dennis G. Driscoll. COLVIN
COLVIN
MEMORANDUM FINDINGS OF FACT AND OPINION
COLVIN, Judge: Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1) [1]
6653(a)(2) [2]
6661
1984
$ 14,333
$ 716.65
[3]
$ 3,583.25
1985
15,225
761.25
[3]
3,806.25
1986
3,128
156.40
[3]
782.00
After concessions, the issues for decision are: (1) Whether petitioners' limousine service activity during 1984, 1985, and 1986 was engaged in for profit under section 183. We hold that it was. (2) Whether petitioners are liable for additions to tax for negligence in 1984 and 1985 under section 6653(a)(1) *719 and (2) and for 1986 under section 6653(a)(1)(A) and (B); for additions to tax for substantial understatement of income tax under section 6661; and for increased interest for substantial underpayments attributable to tax motivated transactions under section 6621(c), formerly 6621(d). We hold that they are not. Section references are to the Internal Revenue Code in effect for the years at issue. Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. 1. Petitioners
Petitioners resided in Saginaw, Michigan, when they filed the petition. Petitioners were married during the years at issue. They are now divorced. They have three children: James, Susan, and Julie, who were 27, 25, and 14, respectively, in 1984. Mr. Jasienski has bachelor's and master's degrees from Western Michigan University, where he majored in business. He has been a business consultant, accountant, and tax return preparer for physicians and dentists for approximately 25 years. Mr. Jasienski has experience in real estate partnerships and has owned rental property. He has been successful in most of his business *720 ventures. Mr. Jasienski learned about the transportation business as a result of his father's employment as a taxi driver for 14 years. Mrs. Jasienski has a degree in English and communications from Western Michigan University. Before the years at issue, Mrs. Jasienski worked for her husband (Medical and Dental Management, Inc.), and held various jobs in insurance and real estate. During 1984 and 1985, Mrs. Jasienski was a Mary Kay Cosmetics distributor. On November 1, 1981, petitioners started a limousine rental service. When the service began, it had two divisions: Silver Lady North and Silver Lady South. 2. Silver Lady North
Silver Lady North was a shuttle service which provided transportation to and from Tri-City Airport (serving Saginaw, Bay City, and Midland) in Saginaw County, Michigan, using vans and station wagons. Petitioners used two nine-passenger vans, a station wagon, and a Mercedes Benz in this business. Bryan Dickey, head of the Tri-City Airport Commission, provided information to petitioners which showed that an airport shuttle business could generate $ 100,000 in gross receipts per year. Petitioners also did their own analysis for 2 weeks at the *721 airport to estimate the demand for an airport shuttle service. As of December 31, 1982, petitioners determined that they were losing approximately $ 1,000 per month from the service, and that the vans and station wagons were experiencing excessive wear. They unsuccessfully attempted to get the airport to subsidize their service. Petitioners realized that revenue projections given to them by the Tri-City Airport manager were incorrect. These factors led petitioners to terminate the airport shuttle service at the end of 1982, after about 14 months of operation. Shortly after petitioners terminated the business, they sold its vehicles and assets and paid the underlying loans and applicable tax liabilities. 3. Silver Lady South
Silver Lady South (Silver Lady) was a limousine rental service. a. Investigation of Limousine Services
Petitioners had not operated a limousine service before starting Silver Lady. Petitioners talked to physicians and dentists who were clients of Mr. Jasienski to get their opinion about the chances of success for such a business. They checked the yellow pages to determine the number of limousine services in the area. Petitioners investigated *722 the type of vehicle to purchase for their business. They went to Detroit, Michigan, to investigate buying used Cadillac limousines and they visited an individual in the Saginaw area who owned many Cadillacs. Petitioners chose to use Rolls Royces after they determined that Cadillacs depreciated substantially when used in this type of service. Based on his review of some automobile publications, Mr. Jasienski believed Rolls Royces not only kept their value but could appreciate in value, thereby reducing petitioners' financial risk. One reason that petitioners began the limousine service was to build a business to give their children because they did not want to attend college. Their daughter Susan later attended Western Michigan University, approximately 120 miles from Saginaw, from the fall of 1985 throughout 1986. Petitioners' limousine service rental rates were higher than those of their competitors because they used Rolls Royces. However, petitioners believed there was a market niche for a Rolls Royce limousine service. b. The 1975 Rolls Royce
In October or November 1981, petitioners purchased a 1975 white Rolls Royce Silver Shadow. The steering wheel in this vehicle *723 is on the left (as is standard in the United States). It holds five passengers, and has air-conditioning and a leather interior. Petitioners paid for it with their own money and a note from a bank. c. State Licensing of Limousine Services
When petitioners began Silver Lady in 1981, the State of Michigan licensed limousine services. As a condition of granting an operating license, Michigan required the applicant to prove the service was needed. To meet this requirement, Mrs. Jasienski gathered letters from 23 business people in Saginaw and the tri-cities, including people affiliated with the Saginaw Chamber of Commerce, which letters expressed the opinion that the limousine service would be a viable business for the metropolitan area. She presented the letters to the Public Service Commission in Lansing. Petitioners were granted a license with a geographical limit of approximately 20 miles beyond the Midland area. Mrs. Jasienski also appeared unsuccessfully before the Public Service Commission in Lansing twice to oppose the granting of a business license to competitors. The State of Michigan deregulated limousine services on December 29, 1982. d. The 1953, 1955, *724 and 1965 Rolls Royces
In 1982, Mrs. Jasienski was named the most innovative businessperson of the year by the Bay City Times for implementing the limousine service. In December 1982, petitioners determined that the limousine service had generated $ 12,000-$ 15,000 during 1982. They purchased three additional Rolls Royces in July 1983. Petitioners needed more than one vehicle for some of their jobs, and to be prepared for possible vehicle breakdowns. Petitioners placed them in service immediately. The first was a 1953 seven-passenger Rolls Royce convertible. The second was a five-passenger 1955 model. The third was a 1965 seven-passenger Rolls Royce Phantom V. These automobiles were not air-conditioned and the steering wheel in each was on the right. Petitioners paid for these three cars with their own money, a bank loan for $ 45,000, and with money they received from cashing in their individual retirement accounts. e. Operation of Silver Lady
The Silver Lady limousine service was managed by Mrs. Jasienski. Petitioners' son James and daughter Susan worked as chauffeurs for the limousines, and cleaned and maintained them. Susan left her job to work for petitioners *725 with the understanding that she would become part of the business. Mr. Jasienski handled the financial aspects of the business, prepared and maintained the books and records, and helped in the business decision-making process. Petitioners occasionally operated all four vehicles at the same time, such as for a wedding. Occasionally, one limousine broke down and another was needed as a backup. Petitioners did not keep records of which vehicles were used for specific jobs or which vehicles generated gross receipts. They also did not keep mileage records for 1983 through 1986. Petitioners maintained records of their clients and gross receipts for 1984 through 1986. The Silver Lady had 11 jobs in 1984, 18 in 1985, and 38 in 1986. This includes some promotional jobs, which did not bring in receipts. The records do not indicate the number of limousines used for each job. Petitioners had a separate bank account for the limousine service, and they secured business licenses from Saginaw Township for the years in issue. Petitioners obtained telephone lines, business stationery, envelopes, business cards, and promotional material for the limousine service. Petitioners had commercial *726 insurance coverage for the 1975 Rolls Royce. They had personal insurance for the three others, and called their insurance underwriter before using one of them so it would be covered by commercial insurance. When petitioners finished using the vehicle, they called the underwriter to change the coverage. Petitioners hired nonfamily chauffeurs for the years they could afford to do so. They were selective when hiring and fired some of their chauffeurs for violating company standards. Their chauffeurs had chauffeur's licenses and wore uniforms which included a Silver Lady pin. Petitioners required their drivers to clean the Rolls Royces after each run, and to discuss each run. Petitioners filed all required employer-employee forms and wage statements for their employees during the years at issue. Petitioners offered their customers services which included champagne or nonalcoholic beverages, flowers, silver goblets, tea towels, silverware, and music. f. Promotion and Publicity
Petitioners advertised their limousine service in the telephone directory and in Limousine Magazine. Petitioners promoted their business in various ways. They got names of prospective brides and *727 grooms from the engagement announcements in the Sunday newspaper and sent them information about their service. They placed cards advertising their services in hotel rooms. They attended bridal shows at which they distributed information about their services. Petitioners arranged for new mothers and their babies to have a ride home from the hospital in one of their Rolls Royces. Pictures of this were published in a hospital magazine, along with the telephone number for Silver Lady. Petitioners participated in a contest at a shopping mall in 1984, sponsored by a local radio station, in which contestants tried to stuff a million dollars into the trunk of one of their Rolls Royces. Petitioners at times received free advertising in exchange for the use of a limousine. Petitioners participated in a promotion in 1984 or 1985 in which they transported the director of the Saginaw Symphony to the opening night of the symphony in exchange for publicity about their service. Another of petitioners' promotions was to transport award recipients to a civic center on Law Day. Silver Lady received publicity in the form of articles in area newspapers. One article was specifically about Silver *728 Lady. Another article promoted all of the chauffeur services in the area, including Silver Lady. In addition, Silver Lady was featured in 1984 or 1985 on P.M. Magazine -- a television program syndicated throughout Michigan. g. Personal Versus Nonpersonal Use
Petitioners each had their own automobiles for the years at issue and never used the Rolls Royces for personal use. Petitioners were not members of any auto clubs and they did not take the Rolls Royces to auto shows. During the years at issue, the Rolls Royces were kept in a garage at petitioners' residence. h. Effect of Deregulation of Limousine Services
When petitioners started their limousine service in 1981, they had only one competitor in the Saginaw-Bay City area. In the years after deregulation, several other competitors began to operate, which hurt petitioners' business. The Saginaw-Bay City yellow pages listed the following number of limousine services from 1981 through 1987: Number of
Year
Services Listed
1981-1982
1
1982-1983
1
1983-1984
2
1984-1985
8
1985-1986
8
1986-1987
9
Petitioners did not anticipate how the deregulation of the limousine service business in 1982 would affect *729 their business. i. Termination of Operations
Silver Lady stopped operating on December 31, 1986. Petitioners attempted to sell one of the Rolls Royces in Las Vegas in 1984. They were also contacted by a man interested in purchasing one of the vehicles. Neither of these contacts, however, resulted in sales. Petitioners were prevented from disposing of the Rolls Royces from February 4, 1988, through April 3, 1989, during their divorce proceedings. Mr. Jasienski had not sold any of the Rolls Royces as of the time of trial. 4. Petitioners' Tax Returns
Petitioners reported the following income and deductions for their limousine activities, including both Silver Lady North and South: 1981
1982
1983
1984
Income
$    25 $ 49,514 $ 12,342 $  1,984 Deductions
Salaries/wages
-- 16,966 4,349 93 Interest expense
-- 1,333 2,214 -- Taxes
1,036 2,752 4,422 -- Depreciation
601 14,506 40,921 38,171 Employee benefit
419 1,738 302 -- programs
Maintenance/
-- 436 658 n1 utilities
Stationery/
70 1,827 312 -- postage
Telephone
50 1,870 1,916 n2 240 Misc. office
21 912 170 8 supplies/
expenses
General fees
10 2,049 1,340 -- Promotion
169 183 -- -- Automobile
1,053 11,896 10,961 349 Travel
753 1,489 4,502 915 Laundry
-- 22 9 100 Insurance
-- 5,271 7,946 1,817 Business meetings
-- 476 103 -- Education
-- 8 -- -- Advertising
-- 1,097 1,069 88 Dues/journals
-- -- 35 -- Wedding supplies
-- -- 343 -- Federal
-- -- -- 53 unemployment
License tabs
-- -- -- 150 Legal/prof.
-- -- -- -- services
Heating
-- -- -- -- TOTAL
[3] $ 4,182 [3] $ 64,831 [3] $ 81,572 $ 41,984 DEDUCTIONS
NET
<$ 4,156>
<$ 15,316>
<$ 69,230>
<$ 40,000>
PROFIT/LOSS
*730 1985
1986
Income
$  3,404 $  4,068 Deductions
Salaries/wages
-- -- Interest expense
-- -- Taxes
-- -- Depreciation
38,171 7,338 Employee benefit
-- -- programs
Maintenance/
23 [1] -- utilities
Stationery/
-- -- postage
Telephone
[2] 318 [2] 284 Misc. office
127 [1] 316 supplies/
expenses
General fees
10 10 Promotion
45 -- Automobile
2,597 3,384 Travel
-- -- Laundry
-- -- Insurance
1,860 2,775 Business meetings
-- -- Education
-- -- Advertising
-- 40 Dues/journals
-- -- Wedding supplies
-- -- Federal
-- -- unemployment
License tabs
-- -- Legal/prof.
278 888 services
Heating
152 48 TOTAL
$ 43,581 $ 15,083 DEDUCTIONS
NET
<$ 40,177>
<$ 11,015>
PROFIT/LOSS
Petitioners reported wage *731 income as follows for 1981 through 1986: 1981 -- $ 57,500; 1982 -- $ 66,485; 1983 -- $ 84,200; 1984 -- $ 101,350; 1985 -- $ 110,125; and 1986 -- $ 64,903. OPINION The principal issue for decision is whether petitioners' limousine activity in 1984, 1985, and 1986 was conducted for profit under section 183. Section 183 disallows certain deductions attributable to an activity not engaged in for profit. The test for deciding whether an activity is conducted for profit is whether it was entered into with "the actual and honest objective of making a profit." Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Engdahl v. Commissioner, 72 T.C. 659, 666 (1979). Whether petitioners had the requisite profit objective is decided based on all of the facts and circumstances. Elliott v. Commissioner, 84 T.C. 227, 236 (1985), affd. without published opinion 782 F.2d 1027 (3d Cir. 1986); sec. 1.183-2(b), Income Tax Regs. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *732 Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of factors which can be used in deciding the existence of a taxpayer's profit objective. No single factor controls. Abramson v. Commissioner, 86 T.C. 360, 371 (1986); Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(b), Income Tax Regs. We will examine each factor individually. 1. Manner in Which the Activity is Conducted
The first factor is the manner in which the taxpayer carries on the activity. Sec. 1.183-2(b)(1), Income Tax Regs. Evidence of a businesslike manner is relevant in deciding whether a taxpayer engaged in an activity with a profit objective. Elliott v. Commissioner, 90 T.C. 960, 971-972 (1988), affd. without published opinion 899 F.2d 18 (9th Cir. 1990). Complete and accurate recordkeeping may indicate that an activity is engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. A change of operating methods or abandonment of unprofitable methods may indicate a profit objective. *733 Sec. 1.183-2(b)(1), Income Tax Regs.
Respondent concedes that petitioners kept adequate books and records and provided limousine services to customers in a professional manner. However, respondent argues that petitioners should have spent more to advertise commercially, and that their reliance on free promotions and word-of-mouth publicity in a new service-oriented activity shows that they did not carry on the activity in a businesslike manner. We disagree. Petitioners promoted the service in several ways that required ingenuity and hard work. We believe that petitioners were imaginative in advertising their limousine service, using approaches that were less expensive than more traditional alternatives. Respondent criticizes petitioners for their decision to expand from one to four limousines. We disagree. Petitioners believed they needed additional limousines for customers wanting to use more than one, and in case of mechanical problems. Respondent asserts that, had petitioners actually engaged in this activity for profit, they would have ceased doing business in 1983 or 1984. We disagree. Petitioners began Silver Lady in 1981. We do not believe they continued excessively *734 long their efforts to make the limousine service profitable. 2. Expertise of the Taxpayers
The second factor is the expertise of the taxpayers or their advisers. Sec. 1.183-2(b)(2), Income Tax Regs. Preparation for an activity by extensive study of its accepted business, economic, and scientific practices, and consultation with those who are expert therein, indicate that the taxpayers entered into the activity for profit. Sec. 1.183-2(b)(2), Income Tax Regs.
Respondent asserts that petitioners had little or no prior expertise in the transportation business and that they did not adequately investigate business prospects before buying the Rolls Royces. We disagree. Mr. Jasienski gained some experience through his father's years as a taxi driver. Before starting Silver Lady, petitioners each had useful business sales and marketing experience, although not in the limousine business. Petitioners researched the potential for the service before they began it. They successfully demonstrated to Michigan State officials that the service was needed, as required to obtain a limousine service operator's license. Respondent points out that petitioners were unaware of geographic *735 limitations applicable to their operating license, and argues that this shows they planned poorly. We disagree; they received the license following a demonstration of demand for the service from their community. Petitioners expected to meet that demand. Petitioners also investigated which type of vehicle to purchase for their business. These things tend to show that petitioners had a profit objective. 3. Time and Effort Spent in Conducting the Activity
The third factor is the time and effort expended by the taxpayers in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs.
Respondent maintains that the time which would have been necessary to promote the activity, train the drivers, maintain the vehicles, and conduct planning sessions could not have been substantial because petitioners had only a few clients. Respondent asserts that the absence of petitioners' daughter, Susan, from fall 1985 through 1986 while attending college 120 miles from Saginaw, shows that petitioners were not engaging in this activity with the requisite profit motive since Susan was one of the main individuals participating in the activity. Although Susan attended school for part of *736 the years at issue, the record amply shows that petitioners devoted much time and hard work in a serious effort to make the limousine service a success. We think that their expenditure of time and effort indicates petitioners' profit objective. 4. Expectation That the Assets Will Appreciate in Value
The fourth factor is the expectation that the assets used in the activity may appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. An activity may produce an overall economic profit, even if there is no operational profit, when appreciation of the assets of the activity is taken into account. Sec. 1.183-2(b)(4), Income Tax Regs. Unrealized appreciation is relevant in determining profit objective. See Farish v. Commissioner, 103 F.2d 63, 65 (5th Cir. 1939), revg. 36 B.T.A. 1114 (1937); Blake v. Commissioner, 38 B.T.A. 1457, 1460 (1938); Lapinel v. Commissioner, T.C. Memo. 1989-685; Stubblefield v. Commissioner, T.C. Memo. 1988-480; Estate of Solomon v. Commissioner, T.C. Memo. 1967-186; Sanderson v. Commissioner, T.C. Memo. 1964-284. *737 Respondent submits that this factor is irrelevant here, arguing that it relates primarily to land or other assets acquired as an investment. We disagree because we believe that, contrary to respondent's position, petitioners had a good faith expectation that the cars would maintain their value or appreciate in value. We believe the type of asset is of less consequence than the parties' good faith intentions. Petitioners assert that Rolls Royces have aluminum bodies that would not rust in Michigan's harsh winters, unlike steel-bodied vehicles. In addition, based on his review of some automobile publications, Mr. Jasienski believed Rolls Royces not only keep their value but may appreciate in value. Respondent also asserts that the fact that Mr. Jasienski still owned the Rolls Royces at the time of trial shows that they were purchased as an investment rather than as business assets. We disagree. Petitioners were unable to sell the cars during much of the time in question. Further, we give greater weight to their good faith expectations that the cars would maintain or increase their value than to whether they have sold the cars. This factor favors petitioners. 5. Prior *738 Business Success of the Taxpayer
The fifth factor is the success of the taxpayer in carrying on other similar or dissimilar activities. Sec. 1.183-2(b)(5), Income Tax Regs.
Respondent asserts that petitioners have no experience that would indicate that they had the ability to succeed in the limousine service business. Petitioners have not engaged in a business similar to the limousine service except for the airport shuttle service (Silver Lady North), an endeavor in which they were unsuccessful. However, they both engaged successfully in other business activities requiring business acumen and entrepreneurial skill. Accordingly, this factor favors petitioners. 6. The Taxpayer's History of Income or Loss
The sixth factor is the taxpayer's history of income or loss with respect to the activity. Sec. 1.183-2(b)(6), Income Tax Regs. A history of losses may indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. However, a profit objective may exist even if there is a history of losses unaccompanied by any gains. Bessenyey v. Commissioner, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). *739 Respondent argues that petitioners had large losses during the years at issue. Petitioners reported the following net losses for their limousine activities for 1981 through 1986: 1981 -- $ 4,156; 1982-$ 15,316; 1983 -- $ 69,230; 1984 -- $ 40,000; 1985 -- $ 40,177; and 1986 -- $ 11,015. However, most of these losses are attributable to depreciation. Without considering petitioners' depreciation deductions for those years, petitioners would have incurred net losses for each year from 1981 through 1986 as follows: 1981 -- $ 3,555; 1982 -- $ 810; 1983 -- $ 28,309; 1984 -- $ 1,829; 1985 -- $ 2,006; and 1986 -- $ 3,677. As stated earlier, we conclude that petitioners believed the Rolls Royces would increase in value or hold their value; thus, respondent's emphasis on tax losses is misplaced. Losses sustained because of unforeseen or fortuitous circumstances beyond the control of the taxpayer do not indicate that the activity was not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. Respondent argues that the harm caused by deregulation was not unforeseen or fortuitous, and that petitioners failed to investigate the business potential of a limousine service. Respondent *740 also asserts that petitioners' claim that deregulation was a primary cause of their losses is unfounded. We do not believe petitioners' failure to anticipate the effect of limousine deregulation on their business detracts from their claimed profit objective. Respondent argues that the fact that Mrs. Jasienski went to Lansing twice to oppose granting operating licenses to competitors shows petitioners were reasonably aware that competition could harm their business. We think it shows that petitioners were attentive to their business and that they believed their business would be better off with less competition, but not that their failure to anticipate the full effect of deregulation was unreasonable. While this effect may be clear in retrospect, petitioners' contention that it was not clear to them before the fact is reasonable. We conclude that increased competition resulting from deregulation hurt petitioners' business, and that it was unforeseen and beyond their control. Respondent argues that if petitioners had done adequate research before they began the limousine activity, they would have discovered that the Saginaw economy would not support it. Respondent cites a January *741 11, 1989, newspaper article in The Saginaw News offered into evidence by petitioners to support this view. We disagree. We think petitioners did not unreasonably fail to anticipate economic trends, and the 1989 article does not cause us to change that view. Petitioners argue, finally, that respondent audited petitioners' 1983 return, which indicated that all four Rolls Royces were in use, but did not question petitioners' limousine activity as not being a legitimate business activity. However, we do not consider the prior year's audit in deciding this case. Harrah's Club v. United States, 228 Ct. Cl. 650, 661 F.2d 203, 205 (1981). 7. The Amount of Occasional Profit, if Any
The seventh factor is the amount of occasional profit, if any, which is earned. Sec. 1.183-2(b)(7), Income Tax Regs. Petitioners concede that they did not show a net profit for any of the years in issue. 8. Financial Status of the Taxpayer
The eighth factor is the financial status of the taxpayer. Sec. 1.183-2(b)(8), Income Tax Regs. Substantial income from sources other than the activity (particularly if losses from the activity generate substantial *742 tax benefits) may indicate that the taxpayer did not engage in the activity for profit. Sec. 1.183-2(b)(8), Income Tax Regs.
Respondent asserts that the financial status of the petitioners allowed them to purchase the four Rolls Royces and to use the depreciation on the vehicles as a tax deduction against Mr. Jasienski's other income. Respondent argues that the fact that the expenses in 1984, 1985, and 1986 were minimal, compared to the depreciation deductions on the four Rolls Royces, tends to show that petitioners were using the tax benefits associated with the limousine activity not only to offset their other income, but to acquire four Rolls Royces. We recognize, as respondent states, that tax savings may induce expenditures that would not otherwise occur. Engdahl v. Commissioner, 72 T.C. 659, 670 (1979). However, we note that in Engdahl, supra, the Court, in holding for petitioners, also said that section 1.183-2(b)(8), Income Tax Regs., cannot be construed as providing an additional reason to deny a deduction merely because the deduction is usable against other income. In cases of this kind, the concurrent existence of other *743 income poses the question, rather than answers it. * * * As long as tax rates are less than 100 percent, there is no "benefit" in losing money.
72 T.C. at 670. We believe that petitioners' wanted to establish a successful business, in part for their children. While they had other income sources, their financial status is consistent with that stated intent. See Nickerson v. Commissioner, 700 F.2d 402 (7th Cir. 1983), revg. T.C. Memo. 1981-321. 9. Elements of Personal Pleasure
The ninth factor is whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b)(9), Income Tax Regs. The fact that the taxpayer derived personal pleasure from the activity is not sufficient to cause the activity to be classified as not engaged in for profit if the activity is, in fact, engaged in for profit as evidenced by other factors. Jackson v. Commissioner, 59 T.C. 312, 317 (1972); Pirnia v. Commissioner, T.C. Memo. 1989-627; sec. 1.183-2(b)(9), Income Tax Regs.
Respondent asserts that petitioners enjoyed the attention *744 they received when driving the cars and that they derived additional pleasure from using the tax benefits generated by the large depreciation deductions to provide employment for their children. Petitioners had their own personal vehicles during the years in issue. They did not use the Rolls Royces for personal use. While petitioners may have taken pride in operating the limousine service, this is consistent with the view that petitioners' objective was to make a profit. This factor favors petitioners. 10. Conclusion
We conclude that petitioners began and operated the Silver Lady with an actual and honest profit objective during the years at issue. Accordingly, we allow petitioners' deductions for the years in issue relating to the limousine service. Respondent determined that petitioners are liable for additions to tax for negligence for 1984 and 1985 under section 6653(a)(1) and (2) and for 1986 under section 6653(a)(1)(A) and (B); for additions to tax for substantial understatement of income tax under section 6661; and for increased interest for substantial underpayments of tax attributable to a tax motivated transaction under section 6621(c). Respondent makes no *745 argument for application of these additions to tax and increased interest except for petitioners' claims to losses from the limousine service. In light of our decision on that issue, we conclude that petitioners are not liable for those additions to tax. To reflect the foregoing, Decision will be entered for petitioners. Footnotes
1. For taxable year 1986, sec. 6653(a)(1)(A). ↩
2. For taxable year 1986, sec. 6653(a)(1)(B). ↩
3. Fifty percent of the interest due on the portion of the underpayment attributable to negligence.↩
3. Differences in amounts shown here from those shown on returns are due to rounding of numbers.↩
1. Utilities for this year are included with telephone.↩
2. Includes utilities.↩